**1.    Excerpts from 5/8/13 deposition of Sylvia Barge**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO:   4:12-cv-00426-WS-CAS


SYLVIA BARGE,

              Plaintiff,                    

vs.

FLORIDA COMMISSION ON HUMAN
RELATIONS and LARRY KRANERT,
individually,

              Defendants.
_____/


DEPOSITION OF:              Sylvia Barge

TAKEN AT THE INSTANCE OF:   Defendants

DATE:                       Wednesday, May 8, 2013

TIME:                       Commenced at 9:15 a.m.
                            Concluded at 4:32 p.m.

LOCATION:                   2894 Remington Green Lane
                            Tallahassee, Florida

REPORTED BY:                Kimberly S. Bartholomew
                            Court Reporter


ACCURATE STENOTYPE REPORTERS, INC.
2894-A REMINGTON GREEN LANE
TALLAHASSEE, FLORIDA 32308   (850)878-2221

1      A      Employment investigations.

2      Q      Okay.   When did you take that course?

3      A      I took that class when I first started working

4  for FCHR.   And I previously worked for -- I previously

5  worked for FCHR in the '80s and so I had been trained

6  previously by EEOC.

7      Q      Okay.   Let me stick with the one when you

8  first started working at FCHR.   I will jump ahead just a

9  little bit here.

10             Your initial hire date at the Commission was

11  when?

12     A      Excuse me?

13     Q      When were you first hired by the Commission?

14     A      July, 2008.

15     Q      Okay.   And so sometime after July, 2008 you

16  took a course on employment investigations that was put

17  on by the EEOC; is that correct?

18     A      Correct.

19     Q      Okay.   Do you remember when exactly in 2008?

20     A      If I'm not mistaken it was in October of 2008.

21     Q      Okay.   And where was that training held?

22     A      New Orleans.

23     Q      Okay.   And is that a course that was sponsored

24  by -- Well, strike that.

25             How was your training and travel paid for to

1    investigations where I had all the parties come in,

2    mediations basically, for a week at a time.  One week

3    out of every month.  And I had a small child and I just

4    didn't want to travel like that so I seeked other

5    employment.

6        Q    Okay.  Let me concentrate on your employment

7    with the Commission beginning in 2008.

8            Okay.  When you started back with the

9    Commission in 2008 you came in in what position?

10       A    I came in as the investigations manager.

11       Q    Okay.  And who did you replace, if you know?

12       A    Two individuals.

13       Q    Okay.  Who are they?

14       A    DeDe McGee, and I'm seeing his face but I

15   can't remember his name.  It will probably come to me

16   later but.

17       Q    And who was the executive director at the

18   time?

19       A    Derick Daniel.

20       Q    Do you know the circumstances why the two

21   positions or these two persons I should say were being

22   replaced by you?

23       A    Well, from what I understand is that there was

24   a backlog and I guess Derick just wasn't pleased with

25   the job and he decided that he wanted to hire someone,

ACCURATE STENOTYPE REPORTERS, INC.

1      Q    All right.  Fair enough.  And so once you took

2  over as the employment investigation manager, your

3  investigator specialists, they would get a case

4  assigned, they would investigate the case, they would

5  draft an investigative memorandum.  It would go through

6  you.  Then you would forward to legal or you would send

7  it back to the investigative specialist and they send it

8  to legal?

9      A    I would send it -- I would review it.  I

10  reviewed every investigative memorandum that every

11  investigator wrote.

12      Q    Okay.

13      A    I would review it, and if there was something

14  in the investigative memorandum that I had concern with

15  I would send it back to the investigator.  But if I

16  approved it I sent it to legal.

17      Q    All right.  How many investigative specialists

18  were there under your supervision when you first became

19  the manager?

20      A    When I first became, if I'm not mistaken I

21  believe 17.

22      Q    Okay.  And at the time of your termination how

23  many investigative specialists were under?

24      A    That changed.  When I started or -- Can I

25  explain something to you?

ACCURATE STENOTYPE REPORTERS, INC.

1      Q      Sure.  Absolutely.

2      A      I started out as the investigations manager in

3   2008, I had 17 investigators.  By April of 2009 I had

4   taken on the intake process and there I inherited I

5   believe three other investigators.

6      Q      Okay.

7      A      And additional clerical staff.

8      Q      So there were actually investigators in the

9   intake and customer service as well as employment?

10     A      Yes.

11     Q      When you assumed the duties of the intake and

12  customer service did the investigators who had been

13  under customer service and intake continue to do

14  customer service and intake responsibilities, or did

15  they lead over to employment?

16     A      They continued to do customer service and

17  intake responsibilities.

18     Q      Okay.  So let me ask it again.  And I

19  appreciate that clarification.

20            At the time that you left the Commission how

21  many investigators were there in the employment, under

22  the employment umbrella?

23     A      I can't recall exactly how many, but I'm going

24  to make a guess and say probably about 14.

25     Q      Okay.  And the same question with respect to

ACCURATE STENOTYPE REPORTERS, INC.

1    director?

2        A    The budget director, I'm assuming Michelle

3    Wilson was still in charge of the budget.   No one had

4    replaced her when she became interim.

5        Q    Co-executive director?

6        A    Co-executive director.

7        Q    Got you.   And so this was basically a

8    management team, right?   This is the group that would

9    have -- did you call it managers' meetings?

10       A    Yes.

11       Q    And how often did managers' meetings take

12   place?

13       A    Once a month.

14            (Defendant's Exhibit 1 was marked for

15       identification.)

16   BY MR. SPELLMAN:

17       Q    Okay.   I want to show you a document that I

18   have identified as Exhibit 1 to your deposition.   And I

19   apologize for the quality of the copies.   If things get

20   recopied enough times they may be hard to read.

21            Do you recognize this document?

22       A    Yes.

23       Q    I'm sorry.   Go ahead.   Did you have any role

24   in developing the duties and responsibilities that are

25   listed on the second page of the exhibit?

```
 1        A    No, I did not.  Not that I recall.
 2        Q    Okay.  Is that your signature down towards the
 3   bottom?
 4        A    Yes, it is.
 5        Q    Okay.  In signing this you understood all the
 6   duties and responsibilities of the role?
 7        A    Yes, I did.
 8        Q    Okay.  To your knowledge is that the position
 9   description that was in place at the time throughout
10   your tenure at the Commission?
11        A    Not throughout my tenure, but once I became
12   the intake manager.
13        Q    Okay.  So this position description, is it
14   your testimony this came into affect once you undertook
15   the intake and customer service unit?
16        A    Yes.
17        Q    Okay.  Did you ever sign another position
18   description prior to --
19        A    The original position description whenever I
20   was hired as the investigations manager I'm certain.
21        Q    Okay.  Do you recall signing a document?
22        A    I'm pretty sure I did.
23        Q    Okay.  All right.  Do you know if you still
24   have a copy of that position description?
25        A    I think probably the copy that I have is the
```

1    most recent copy which would be this one.

2         Q     Right.  Okay.

3         A     But there was only a short time span that I

4    was not the intake manager.  From the time that I was

5    hired in July I believe I took those duties over in

6    April of the following year.

7         Q     So less than a year?

8         A     So less than a year.

9         Q     Okay.  Do you remember what the probationary

10   track was at the time you were hired in July of 2008?

11        A     What was the what?

12        Q     Probationary employment track.  Some people

13   are on probation for 90 days.  Do you remember if there

14   even was one at the Commission?

15        A     I don't even remember it being discussed a

16   probationary period.

17        Q     Okay.

18        A     I know as a state employee there is always one

19   and it is usually six months.

20             (Defendant's Exhibit 2 was marked for

21        identification.)

22   BY MR. SPELLMAN:

23        Q     Okay.  I will show you another document that I

24   have identified as Exhibit 2 to your deposition.  I will

25   ask you if you recognize this document?

ACCURATE STENOTYPE REPORTERS, INC.

 1        A      Yes, I do.

 2        Q      Okay.   What is this?

 3        A      This is manager's accountabilities.   When we

 4   would go to meet with Derick we had monthly managers'

 5   meetings.   These are the things that he wanted us to

 6   talk to him about and where we were with these

 7   accountabilities.

 8        Q      This seems to relate to only employment

 9   investigations.   Do you know if this was -- Do you know

10   when this was crafted?

11        A      I have no idea.   Whenever I got there I

12   believe one of the previous managers said when you meet

13   with Derick you need to take this with you.

14        Q      Okay.   And did you have any role or

15   participate at all in determining what the specific

16   accountabilities or general accountabilities were that

17   are listed on this exhibit?

18        A      Not that I recall.   I believe this was a

19   document that was given to me.

20        Q      Do you remember by whom?

21        A      I don't.

22        Q      Okay.   And so you understood this document to

23   be basically the priorities that Mr. Daniel as executive

24   director was wanting to hear from you on a monthly

25   basis?

1      A     Yes.  Well, not always -- everything on the

2  list was not something that you reported to on a monthly

3  basis.

4      Q     Okay.

5      A     Okay.  But these were things that from my

6  understanding could come up.

7      Q     Did you consider these to be the priorities of

8  your position?

9      A     Well, they pretty much outline the priorities

10  of my position, but I never really just like looked at

11  them -- I never really paid much attention to it.

12      Q     What do you mean you didn't pay attention?

13      A     Well, I'm saying it's not something I had

14  listed, I looked up at a board to say, okay, I need to

15  do this or I need to do that, blahza-blahza.  I

16  performed my duties and it included these things.  Most

17  of them anyway.

18      Q     Okay.  Did you believe there was any

19  difference between the things listed as specific

20  accountabilities versus general accountabilities?

21      A     Yes.  Specific accountabilities would be to

22  me, and priority, would be getting the cases

23  investigated, reviewed and out as far as -- as well as

24  getting complaints documented within the required time

25  frame after they have been date stamped, assigned for

1   investigation.   Those were my --

2            And then I had other things that are not on

3   here that I was responsible for because this basically

4   is just employment investigations.   This doesn't have

5   anything on here about what was required of me once I

6   became the intake manager.

7        Q    Right.   Do you know if there was another

8   document that listed the accountabilities once you

9   assumed those additional responsibilities?

10       A    No.

11       Q    You just don't know?

12       A    I never saw one.

13       Q    There wasn't one to your knowledge?

14       A    Not to my knowledge.

15       Q    Okay.   I'm not trying to badger you.

16   Sometimes the answer I don't know, you don't know if it

17   means the person doesn't recall --

18       A    I understand.   I understand.   But as I'm

19   looking at this, this has nothing to do with the

20   tremendous amount of responsibilities that I inherited

21   when I took on the intake unit.

22       Q    Okay.   All right.   Let me show you a document

23   that I'm going to identify as Exhibit 3 to your

24   deposition.

25            (Defendant's Exhibit 3 was marked for

ACCURATE STENOTYPE REPORTERS, INC.

1          identification.)

2               MS. MATTOX:   Is this a good stopping point?

3          Could we take a bathroom break?

4               MR. SPELLMAN:   Sure.

5               (A break was taken off the record from

6          10:17 a.m. to 10:23 a.m.)

7     BY MR. SPELLMAN:

8          Q    Ms. Barge, when we took a break I had just

9     handed you what I have identified as Exhibit 3.   It

10    appears to be an email from Derick Daniel to you in

11    September of 2008.

12              I'm not going to ask you if you recall

13    receiving this particular email.   But the performance

14    expectations that are on the back on the second page of

15    the document, do you recall receiving those

16    expectations?

17         A    I don't recall receiving them but I'm pretty

18    sure I did.

19         Q    Okay.   Do you know of other performance

20    expectations that you were given by Mr. Daniel during

21    this time frame?

22         A    No, I do not recall.

23         Q    Do the 11 enumerated items on that second page

24    appear to accurately reflect what you recall were your

25    performance expectations when you became the employment

1    investigative unit manager?

2        A    Yes.

3        Q    Okay.  And do you know if there was ever a

4    document similar to this one, the second page of this

5    third exhibit, that laid out the performance

6    expectations for you for any period of time after you

7    assumed the additional duties for customer service and

8    intake?

9        A    Not that I recall.

10           (Defendant's Exhibit 4 was marked for

11       identification.)

12   BY MR. SPELLMAN:

13       Q    Okay.  Let me show you a document that I have

14   identified as Exhibit 4 for your deposition.

15           And so you know how emails work, the early one

16   starts at the bottom and works its way up.  So I guess

17   this one starts at the bottom of page one as an email to

18   you, October 2, 2008, and then a response by you and

19   response by Derick on the same day, basically all within

20   about two hours, regarding what you would be prepared to

21   address during the meetings, I would imagine the

22   management team meetings?

23       A    No, these are personal monthly meetings with

24   Derick.

25       Q    Okay.  So do you recall receiving this email?

ACCURATE STENOTYPE REPORTERS, INC.

```
 1        A    I don't recall receiving it but I'm pretty
 2   sure I did.
 3        Q    All right.  And the things that are listed in
 4   Mr. Daniel's original email starting on the bottom of
 5   the first page and then crossing over onto the -- I
 6   don't know how many numbers there are.
 7        A    Which email?
 8        Q    Exhibit 4.
 9        A    Okay.
10        Q    Yes, ma'am.  So on page two of that email
11   there is sort of a list of things, backlog, number of
12   cases closed within 180 days, number of cases sent to
13   legal within blank days, etc., etc.  Those items were
14   items that Mr. Daniel wanted you to discuss with him in
15   your I will call them one-on-one meetings; is that
16   right?
17        A    Yes.
18        Q    Okay.  And this is pretty early in your tenure
19   as the employment unit investigations manager; is that
20   right?
21        A    Correct.
22        Q    And did you understand from Mr. Daniel that
23   these would be the subjects that you would report about
24   and discuss at every meeting?
25        A    No, that meeting.  As he said, this is what I
```

1  want to discuss with you on Monday.

2       Q    Well, no, I think that's a number --

3       A    Oh, he did say for this and future meetings.

4  It would be year-to-date on the previous month, yes.

5       Q    So as a part of the management team you had

6  your management meetings that you discussed that was one

7  a month, and those were attended by the people that you

8  listed earlier?

9       A    Correct.

10      Q    Managers of different departments, the general

11  counsel, the executive director, you know, maybe the

12  public information officer who might not oversee a

13  department but was in those meetings, correct?

14      A    Correct.

15      Q    And in addition to that you had one-on-one

16  meetings with the executive director?

17      A    Yes.

18      Q    And was that once a month as well?

19      A    It was scheduled to be once a month.  In my

20  case I had the first Thursday of every month at 9:00 a

21  standing appointment with Derick to have a one-on-one

22  meeting about my section.  Did we always have the

23  meeting?  No.

24           Actually, as time went on Derick and I rarely

25  met on the one-on-one because he would say I don't have

1      A     I would think it probably was more like -- it

2  was after I took over intake.

3      Q     Right.  Was Derick still there?

4      A     Derick was still there.

5      Q     Okay.  Do you know of any source that could be

6  determined when legal made that announcement?

7      A     Well, we had -- all of the meetings were

8  recorded.  I can only say that unless you depose some of

9  the other managers in the meeting to recall if they

10  actually heard that too.

11      Q     Okay.

12      A     That would probably be the best way because I

13  can't give you a time frame unless you want to listen to

14  every recorded meeting which I don't think you would.

15      Q     Do you remember who made that announcement?

16      A     The general counsel.

17      Q     Mr. Kranert?

18      A     Yes.

19      Q     Okay.  Tell me about the additional duties

20  that you assumed when you took over the customer service

21  and intake unit?

22      A     When I took over the customer service, intake

23  unit I not only took over the process and the approval

24  of bringing -- intaking complaints, I also took over

25  customer service which included the mail, the telephone

1    and copy requests.  It also included records management

2    as far as being responsible for making sure that records

3    that we had stored at the state location was destroyed

4    in a timely fashion once they reached their age for

5    destruction.

6         Q    Okay.

7         A    It also included me being the Governor's

8    liaison for the office which required me to report to

9    the Governor's office weekly the status of any

10   complaints or requests that they had made to our office.

11        Q    Now, what do you mean by the status of

12   complaints?  Overall or specific complaints?

13        A    Specific complaints that came from the

14   Governor's office.  Say, for example, if someone makes a

15   complaint to the Governor's office and the Governor's

16   office determines that is something that should come to

17   our office they then would refer it to our office for a

18   response.

19             Or if it was about our office they would send

20   it to us and I would be responsible for making sure that

21   it got to the right person for the correct answer, and

22   then follow up with that person to find out what the

23   status of it was.  And I would report it back to the

24   Governor's office as to what the status of that was,

25   whatever it may be.

ACCURATE STENOTYPE REPORTERS, INC.

1    for customer service and intake included the process and

2    approval of intaking complaints?

3         A    (Witness nods head.)

4         Q    Overseeing the mail, phone and copy requests?

5         A    (Witness nods head.)

6         Q    Records management including I guess

7    communication with I guess state archives on what can be

8    destroyed?

9         A    Right.

10        Q    Okay.  The liaison to the Governor's office.

11             What other additional duties have you not told

12   me about?

13        A    All right.  We had a deferral clerk who

14   brought the complaints that were being investigated by

15   EEOC, that was part of our responsibility also, to have

16   those documents scanned and recorded into our computer

17   system.

18        Q    Okay.

19        A    There is a record of that case being dual

20   filed with the Commission.

21        Q    Okay.  What other responsibilities?

22        A    At this time I can't recall.  But, I mean,

23   whatever needed to be done I basically did it, I mean.

24        Q    I know I asked you about those emails that had

25   like performance expectations, and we've talked about

1    the job description that is an exhibit that was formed

2    after you took on these additional duties.

3            But do you know of any other document that I

4    have not shown you that listed out either duties and

5    responsibilities or specific performance metrics by

6    which you would be measured that took into account the

7    customer service and intake unit?

8        A    No, I do not recall.

9        Q    Now, let me follow up with you on a couple of

10   those things.  When you say the process and approval of

11   intaking case, explain to me what that means.

12       A    Well, there are a couple things that have to

13   be established whenever a case is accepted for

14   investigation.

15           Number one, it has to be timely filed.  Number

16   one, it has the meet the prima facie elements of a

17   discrimination complaint.  Number two -- number three,

18   it has to be properly signed.  We are getting them from

19   other agencies so we have to make sure that it's

20   properly date stamped.

21           We also have to make sure that depending on

22   what the case is, if it's only filed under the laws that

23   are investigated by the State of Florida that it's a

24   state only case.  Or if it's something that is covered

25   by both the state and federal laws then it's also dually

ACCURATE STENOTYPE REPORTERS, INC.

1   filed with the EEOC.

2          You need to make sure that it's properly

3   framed, it's readable, understandable.  That the

4   investigator has communicated with the complainant and

5   gotten the needed information to frame the complaint.

6   That if we haven't gotten the complaint back from a

7   complainant within a certain time frame that they are

8   contacted to let them know that if they don't respond

9   back within a certain time frame their complaint will be

10  closed.

11         So there are a number of factors that need to

12  be made sure that's done prior to accepting a complaint

13  in.

14     Q     And accepting a complaint in, does that mean

15  getting a case number or is that the referral to a

16  different unit?  What do you mean by that?

17     A     Once the case goes to the intake process then

18  it's accepted for investigation.  So then it's assigned

19  to the investigation unit which also happened to be me.

20  And then I would assign the case to an investigator.

21     Q     Okay.  Before it goes to your employment unit

22  investigator, the minute it is filed is it given a case

23  number?

24     A     The minute it is date stamped and into our

25  office it is then given a case number.  It's then given

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    I am just wondering.  Do you know if there was

2    any difference under the work share agreement if a

3    complaining party filed their initial charge with the

4    Florida Commission on Human Relations or the EEOC?

5    A    No.  As far as payment, as far as the case

6    that we would be taking, no, as long as that case was a

7    case that was under that -- could be investigated under

8    both laws it didn't matter whether we intake the case or

9    if EEOC sent us the case.

10   Q    Okay.  You had mentioned, I'm going to back up

11   a second, you had mentioned something about a deferral

12   clerk when you were talking about intake.  What is a

13   deferral?

14   A    A deferral is a case that EEOC is

15   investigating.  But just as I explained how we document

16   it in the information system cases that we were

17   investigating but dual filing with EEOC, EEOC would send

18   us a copy of the complaints that they were

19   investigating.  That is a deferral.

20   Q    So --

21   A    It's not sent to us for investigation.  It's

22   sent to us as a record of a case that has been filed.

23   Q    And that they are taking the lead?

24   A    Yes.

25   Q    And so under that arrangement, I mean, it's

ACCURATE STENOTYPE REPORTERS, INC.

1    your understanding that FCHR wouldn't be compensated

2    anything under the work share?

3         A    Oh, not for a deferral.

4         Q    But the EEOC might be -- the case that they

5    might be investigating might include 760 state law

6    discrimination claims?

7              MS. MATTOX:  Object to the form.

8         A    It has to.

9    BY MR. SPELLMAN:

10        Q    Well, it has to have federal claims.

11        A    Right.  But the reason that they are

12   deferring, they wouldn't defer it to us if it was only a

13   federal claim.

14        Q    Good point.

15        A    Okay.  What it does is you send it to us so if

16   the party chooses to file in state court or in federal

17   court there is a record that that case was dual filed

18   with the state agency, and that's what a deferral is.

19        Q    So their deferral is basically getting a case

20   number assigned by the Commission to the charge that the

21   EEOC is maintaining control over?

22        A    We don't give it an FCHR case number, not a

23   deferral.

24        Q    Okay.

25        A    It comes with an EEOC case number only.  And

ACCURATE STENOTYPE REPORTERS, INC.

1    it's never put into our case management system.  It's

2    put into a separate system.

3         Q    Okay.

4         A    Or it was put into a separate system.

5         Q    What system was it put into?

6         A    To be perfectly honest with you I don't

7    understand what that system was.  It was a drive, I want

8    to say like a K drive, and they were all scanned into a

9    particular drive on the computer.

10        Q    Okay.  When the EEOC does send you a case is

11   that a referral?

12        A    When they send us a case for investigation

13   that's a referral.

14        Q    Okay.  So that's the difference between a

15   referral and a deferral?

16        A    Correct.

17        Q    Okay.  And does the Commission to your

18   knowledge -- Did the Commission have any say so when the

19   EEOC decided to defer a case?

20        A    No.  We don't know literally, and I am telling

21   you literally, we would get deferrals in by the hundreds

22   a week.

23        Q    With no explanation, just --

24        A    Well, we just know, you know, it comes in the

25   package, it's a deferral.  We know it's a deferral, it

ACCURATE STENOTYPE REPORTERS, INC.

```
 1    relationship between the Florida Commission and the

 2    EEOC?

 3         A    Particulars forms?

 4         Q    Yeah.  Do you remember any particular EEOC

 5    forms, form number this or form number that that dealt

 6    with these?

 7         A    Oh, yes.  We regularly referred to forms by a

 8    number.

 9         Q    Okay.  So what are some of the forms that you

10    recall?

11         A    I can't recall the numbers but we regularly

12    referred to them.  I want to say 213 or 231.

13         Q    Is it 212, is that one?

14         A    212, that's it.

15         Q    I have seen two different ones, I've seen one

16    called I think a 22-L or something like that.  That may

17    not be an EEOC form.

18              Let me ask you about the EEOC --

19         A    212.

20         Q    -- 212 form.  What is that?  What is your

21    understanding?

22         A    If I'm not mistaken, and I'm not looking at

23    it, the 212 is the form that EEOC sends to us that is

24    attached to the deferral.

25              It's been a while, I haven't done it in a
```

ACCURATE STENOTYPE REPORTERS, INC.

1    while, and I can't be certain.  But if you would show it

2    to me I could tell you what it is.

3        Q    I don't have one.  I just have read about them

4    and I have absolutely no understanding of them.

5        A    I believe that that's the form.  Remember that

6    we discussed that you would certify that we received the

7    charge, I believe that's the 212.

8        Q    Okay.  Was it your responsibility or part of

9    your responsibility as the manager of employment

10   investigations to review the 212 forms?

11       A    It was my responsibility to make sure that

12   those forms were -- it was my understanding that my

13   responsibility was to make sure that those forms were

14   scanned in a reasonable length of time and documented

15   that we had received it.

16            But as far as being able to review hundreds of

17   deferrals, it just wasn't humanly possible for me to do.

18   There was just no way I could have done that.

19       Q    Now, you mentioned that it was your

20   understanding they had to be scanned within a reasonable

21   time.  Can you tell me what that means, what a

22   reasonable time is?  What your understanding of it was.

23       A    How do I explain this?  Deferrals, not that

24   they weren't important, but in the scheme of the things

25   that I had to accomplish as manager of both those units

1  it was probably my least priority because if it wasn't

2  scanned in we could still find it if it was sent to us

3  and we could certify it and get it to whoever requested

4  it.

5        The position that was a deferral clerk, not

6  only did they scan the deferrals, they had other

7  responsibilities, too.

8        And at that particular time during my tenure

9  there as the investigations manager, I had a deferral

10  clerk work as an assistant to an investigator who was

11  sight impaired, was blind.

12     Q    Okay.

13     A    Okay.  So she spent part of her time working

14  with that investigator, scanning her documents, reading

15  documents to her that couldn't be converted into Braille

16  and doing those things that she couldn't do for herself.

17     Q    Okay.

18     A    We tried to keep it up as best we could.  But

19  not only that, the position was constantly over -- there

20  was turn over in the position as well as just the sheer

21  number that you got in on a weekly basis.

22     Q    Okay.  So it sounds like was there -- are you

23  saying that there was a backlog of these EEOC 212 forms?

24     A    I wouldn't call it a backlog.

25     Q    Okay.

ACCURATE STENOTYPE REPORTERS, INC.

1    A    As far as I know -- Well, I do know that they

2    were being scanned because any time someone would call

3    and I would have to go into that K drive I would have to

4    assign it back to the deferral clerk for her to certify

5    it, copy it, and mail it out.

6    Q    Okay.

7    A    And I never had a problem finding them.

8    Q    Okay.  Now, again, not understanding what

9    these forms are, did you have an understanding that the

10   Commission had a responsibility for any kind of action

11   in response to those forms?  So, for example, did they

12   have to send something back to the EEOC?

13   A    That was brought to my attention probably, I

14   don't know, two weeks, maybe three, prior to my

15   termination that the general counsel had discovered

16   somewhere in writing that the Commission was supposed to

17   be sending these documents back to EEOC after they had

18   been signed by the executive director.

19   Q    Okay.  And so prior to that time you did not

20   have an understanding of that?

21   A    No, I did not.

22   Q    Okay.  Did you ever do anything to verify

23   whether what the general counsel told you was accurate

24   or not accurate?

25   A    Basically I really didn't have time to verify

1    it.

2         Q     Okay.

3         A     Shortly thereafter I was told this and then

4    prior to my being terminated I was removed as the intake

5    manager.

6         Q     Do you know if as a part of the response to

7    the EEOC 212 form the Florida Commission on Human

8    Relations could request the jurisdiction be transferred

9    from the EEOC to the Florida Commission on Human

10   Relations?

11        A     Not to my knowledge just by the 212 form.  We

12   did it regularly on a regular basis, though, just

13   through verbal communication with the intake manager of

14   either Miami or EEOC, or the work share coordinator.

15        Q     Now, the work share coordinator, that's

16   somebody different.  Is that Ozzie Black?

17        A     No, that is Ina Depass (phonetic).

18        Q     Okay.

19        A     Or was Ina Depass.

20        Q     Out of the Miami office as well?

21        A     Out of the Miami office.

22        Q     What was Ozzie Black's role?

23        A     Ozzie, I'm not exactly sure if he is assistant

24   director or something of that nature.  I'm not exactly

25   sure what his role is.  I just know that that's who

1      A     Well, after I wouldn't grant her the 30 days

2  extension on a rebuttal she requested my personnel file

3  and I'm responsible for the copying of copy requests so.

4      Q     Other than requesting your personnel file,

5  though, was there an actual complaint that was lodged to

6  your knowledge?

7      A     I don't know that she actually lodged a

8  physical complaint.  I know that she requested my

9  personnel file.

10     Q     Do you know if she called anybody and

11 complained?

12     A     I'm not sure.  I don't remember if Derick ever

13 discussed her calling me.  I do know that Larry told me

14 that she had requested my personnel file.  I don't

15 remember that it was a formal complaint.

16           And at the time that I was at the Commission

17 denying somebody that opportunity is an every day

18 occurrence.  She just wasn't happy about it.

19     Q     Okay.  Anyone else you can think of that you

20 were advised or you became aware of that had filed any

21 kind of complaint --

22     A     Not that I recall.

23     Q     -- formal or informal?  Not that you recall?

24     A     Not that I recall.

25     Q     Okay.  Anyone else at the Commission, so not

```
 1   identifying as Exhibit 5 to your deposition.
 2              (Defendant's Exhibit 5 was marked for
 3        identification.)
 4   BY MR. SPELLMAN:
 5        Q    Do you recall this document?
 6        A    Yes, I do.
 7        Q    Okay.  And can you tell me what were the
 8   circumstances that were behind your writing this email?
 9        A    Derick asked the managers to give him our
10   observations about issues that we were complaining about
11   Larry.
12        Q    Do you know why at this particular snapshot in
13   time in November of 2010 Mr. Daniel requested this
14   input?
15        A    Yes, I do.
16        Q    Okay.  Can you tell me what that is?
17        A    One of my investigators came to me highly
18   upset and was complaining that Mr. Kranert had made some
19   very inappropriate comments regarding another
20   investigator after she approached a group of legal
21   employees and advised them of comments that they were
22   making about Christians she found offensive.
23        Q    Okay.  Now, the investigator that came to you
24   complaining, who was that?
25        A    Emily Davis.
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1       A     No, I did not.

 2       Q     How about prior to being terminated?

 3       A     No, I did not.

 4       Q     Okay.  Do you have any knowledge if Mr. Daniel

 5   shared this email with anyone else?

 6       A     No, I do not.

 7       Q     You were aware of the policies and procedures

 8   at the Commission as an employee, the handbook and

 9   various other policies and procedures?

10             MS. MATTOX:  Object to the form.

11       A     Yes, I've been given them.

12   BY MR. SPELLMAN:

13       Q     Okay.  You knew that the Commission had a

14   grievance policy?

15             MS. MATTOX:  Object to the form.

16       A     Yes.

17   BY MR. SPELLMAN:

18       Q     Did you consider this to be a grievance?

19       A     No.

20       Q     This email is specifically your concerns --

21   I'm sorry, your observations about Mr. Kranert, correct?

22       A     Correct.

23       Q     Okay.  And you were seeking Mr. Daniel to

24   authorize an investigation; is that correct?

25       A     Could you clarify that?
```

ACCURATE STENOTYPE REPORTERS, INC.

1   agency?

2       A    I believe that it had a negative affect on the

3   agency as well as a disregard for the laws that we were

4   empowered to protect and enforce.

5       Q    Were you concerned that staff might perceive

6   Mr. Kranert's manner of conducting himself as harassing

7   or discriminatory?

8       A    Yes.

9       Q    Now, is there anywhere in this email where you

10  state that you perceived him as harassing or

11  discriminatory?

12          MS. MATTOX:  Best evidence.  You can still go

13      ahead and answer.

14      A    I'm thinking of my answer.

15          MS. MATTOX:  And look at this.  He has asked

16      whether anything in that document.

17      A    I remember this specifically.  And the overall

18  content of my letter would state, my email, would say --

19  would indicate that, yes, I perceived his actions to be

20  that way.

21  BY MR. SPELLMAN:

22      Q    Okay.  But my question is, is there any

23  statement in here that you said that I, Sylvia Barge,

24  perceive Larry Kranert as harassing or discriminatory?

25      A    Not specifically.

ACCURATE STENOTYPE REPORTERS, INC.

1      Q    Okay.  Did you have any follow up discussions

2  with Mr. Daniel after you sent him this email?

3      A    No, I did not.

4      Q    Do you contend that as a result of this email

5  you were retaliated against?

6      A    No, I do not.

7      Q    Okay.  I should have asked that first.

8           What complaints did you make directly to

9  Mr. Kranert, if any, about discriminatory or harassing

10  behavior or statements?

11      A    Directly to Larry?

12      Q    Yes, ma'am.

13      A    None.

14      Q    What complaint did you make to Mr. Daniel on

15  your own behalf of discriminatory statements or actions

16  or harassing statements or actions by Mr. Kranert?

17      A    Is it appropriate for me to restate your

18  question to see if I understand what you are asking?

19      Q    It was a very poorly worded question.  You

20  certainly may.

21      A    Are you asking me did I as an individual say

22  to Derick Daniel that Mr. Kranert was discriminating

23  against me?

24      Q    Yes, ma'am.

25      A    No, I did not.

ACCURATE STENOTYPE REPORTERS, INC.

1    question so that I will understand what you are asking

2    me?

3          Q     Give it a shot.

4          A     Did I talk to anyone about it or did I have a

5    formal meeting to discuss the issue?

6          Q     No.  Did you talk with anyone, that's fine.

7          A     Yes, we all talked about it because it was an

8    explosive meeting.

9          Q     Okay.  Who is all?

10         A     Particularly John Peck who was new and the

11   public information officer came to my office immediately

12   afterwards and it was just, you know, amazed.  And his

13   comment to me was even I know you don't say something

14   like that.

15               So we did discuss it among ourselves that it

16   was pretty outrageous.  But no formal meeting.

17         Q     Who else did you talk with about it?

18         A     Regina Owens.

19         Q     Okay.  Anyone else?

20         A     I believe that probably was the only two

21   people.

22         Q     Okay.  Do you contend that as a result of your

23   speaking in that meeting in July of 2011 you were

24   retaliated against?

25         A     No, I do not.

1          (Defendant's Exhibit 6 was marked for

2      identification.)

3   BY MR. SPELLMAN:

4      Q    Okay.  Ms. Barge, I'm going to show you a

5   document that I identified as Exhibit 6 to your

6   deposition.

7          I would ask you to take a look at it, the

8   first page, and then the letter that is attached several

9   pages to it, five pages to it.

10          Are you ready?

11      A    Oh, yeah.  Did you ask me something specific?

12      Q    No, ma'am.  I was just letting you review it.

13   I wanted to make sure you were ready to go.

14          Tell me what these documents are.

15      A    This is a letter that I wrote to the

16   Governor's office about concerns that I had at the

17   Commission.

18      Q    Okay.  So it appears to me, and correct me if

19   I'm wrong, that the second page of this exhibit is the

20   actual letter to the Governor?

21      A    Yes.

22      Q    And it is dated August 14th, 2011, correct?

23      A    Correct.

24      Q    Okay.  Who drafted this letter?

25      A    I did.

1    Q     Where did you draft this?

2    A     At home.

3    Q     Did you have any assistance?

4    A     No.

5    Q     Okay.  Did you know at the time that you wrote

6  this letter that Ms. Owens was also preparing a letter

7  to the Governor's office?

8    A     I didn't know that she was preparing a letter

9  to the Governor's office, no.

10   Q     Did you know she was preparing a letter

11  expressing concerns of whistle blower activity at the

12  Commission?

13   A     Not at the time that I wrote this letter.

14   Q     Okay.  Did you know at the time that you were

15  writing this letter that Ms. Owens had been caught

16  accessing and disseminating documents from the computer

17  system?

18   A     No, I did not.

19   Q     Okay.  Did you know at the time that you wrote

20  this letter that Ms. Owens' computer privileges had been

21  suspended at the Commission?

22   A     I don't believe they were.

23   Q     You don't believe --

24   A     Not at the time I wrote this letter.

25   Q     Okay.  How was this letter delivered?

1      A      By email.

2      Q      Okay.

3      A      To the Governor's office.

4      Q      Okay.  But that is not the email that is on

5  the first page of this exhibit, is it?  Or is it.  This

6  seems to say you had already had a conversation with

7  somebody, that's why I'm asking.

8      A      I don't remember writing this, but I may have.

9  But this is not -- I didn't send the original letter to

10  the Inspector General.  I sent the original letter to

11  the Governor's office.

12      Q      Okay.  By email?

13      A      By email.

14      Q      And was there a particular person that you

15  sent it to in the Governor's office?

16      A      No.  There is a contact the Governor page.

17      Q      I don't know.

18      A      Yes, and there is instructions.

19      Q      Okay.  And so that's how you sent it?

20      A      That's how I sent it.

21      Q      Okay.  And what happened next after you sent

22  it?

23      A      After I sent the letter I can't recall whether

24  or not the Governor's Inspector General called me or if

25  I called to find the status of my letter and I was

```
 1    emailed this letter to the Governor did you copy anyone

 2    or share that email to the Governor with anyone?

 3         A    I did.  I can't recall if it was when I sent

 4    it to the Governor or after I sent it to the Governor.

 5    I do know that I did inform Ms. Owens that I was writing

 6    a letter to the Governor and so I don't know if I shared

 7    this with her prior to me sending it or after.

 8         Q    Okay.  Anyone other than Ms. Owens?

 9         A    Only Ms. Owens.

10         Q    Okay.  And, likewise, the email that you have

11    here to the Chief Inspector General's Office, did you

12    share that or copy that with anyone?

13         A    No.

14         Q    Okay.

15         A    Not to my knowledge.

16         Q    Okay.  Let me show you what I'm identifying as

17    Exhibit 7.

18              (Defendant's Exhibit 7 was marked for

19         identification.)

20    BY MR. SPELLMAN:

21         Q    Do you recall receiving this letter?

22         A    Yes, I do.

23         Q    Okay.  Now, prior to receiving this letter did

24    you give any kind of a recorded statement or interview?

25         A    No, I did not.
```

1        Q      Okay.  Did you furnish any documents to the

2    Inspector General's Office?

3        A      No, I did not.

4        Q      Okay.  Other than the initial communication

5    you had with them in sending the letter do you recall if

6    you had any communication with the Chief Inspector

7    General's Office between August 23rd and September 1st,

8    2011?

9        A      I do believe that I called them and informed

10   them that I had been terminated from my job on

11   August 29th, and I may have done that on that day.

12       Q      Okay.

13       A      And informed them of the reason I was given.

14       Q      Which was?

15       A      You are a select exempt employee.

16       Q      Okay.  So the only reason was because we can

17   because you are a select exempt employee?

18       A      Right.

19       Q      And you were a select exempt employee,

20   correct?

21       A      Yes, I was.

22       Q      Okay.  Now, do you know of any information or

23   any fact that anyone at the Florida Commission on Human

24   Relations knew that you had filed the complaint with the

25   Chief Inspector General's Office?

1          MS. MATTOX:  Object to the form.

2     A     Repeat the question.

3  BY MR. SPELLMAN:

4     Q     Okay.  Do you have any knowledge that anyone

5  at the Florida Commission on Human Relations knew that

6  you had filed a complaint with the Chief Inspector

7  General's office prior to your termination?

8     A     No, I do not.

9     Q     Ultimately was the complaint lodged with the

10 Chief Inspector General's Office transferred to the

11 Department of Management Services Inspector General's

12 Office?

13    A     Yes, it was.

14    Q     Okay.  And do you remember who you dealt with

15 in that Inspector General's Office?

16    A     Tim Carlisle.

17    Q     And did you provide Mr. Carlisle with any

18 documents?

19    A     The letter.

20    Q     Okay.  Anything else?

21    A     No, I did not.

22    Q     Did you give any kind of an interview or

23 recorded statement?

24    A     Yes, I did.

25    Q     Okay.  And do you know what the outcome of

ACCURATE STENOTYPE REPORTERS, INC.

1       A       No, I'm not.

2       Q       Have you been employed since August 29th,

3    2011?

4       A       No, I have not.

5       Q       What efforts have you made to secure

6    employment since your termination?

7       A       I have applied for jobs that I thought I was

8    qualified for that I was interested in, but I haven't

9    had any interviews yet.

10      Q       You have not had any interviews?

11      A       No.

12      Q       Do you have any applications pending right

13   now?

14      A       Well, I really can't say because you don't

15   always get noticed that a job has been filled.  I most

16   recently got a notice from the City of Tallahassee that

17   a job I applied for had been filled.

18      Q       What job was that?

19      A       It was a human resource person.

20      Q       Management?

21      A       It was not a manager's position but it did

22   have some EEO responsibilities.

23              (Defendant's Exhibit 9 was marked for

24       identification.)

25

ACCURATE STENOTYPE REPORTERS, INC.

1     A     No, I don't.

2     Q     Okay.

3     A     That's interesting.

4     Q     At the time you were terminated who is it --

5   do you have an understanding of who the decision makers

6   were with respect to your termination?

7     A     Do I have an understanding who the decision

8   makers were?

9     Q     Yes, ma'am.

10     A     Well, I wasn't told anything when I was

11   terminated.  Can I explain to you how it happened?

12     Q     Well, let me just get the answer to the

13   question.

14     A     No.  I mean, my direct supervisor would be

15   normally the person who recommends someone for

16   termination.

17     Q     So is it your understanding as you sit here

18   today that the person who made the decision with respect

19   to your termination was Larry Kranert?

20     A     Yes.

21     Q     And you believe that Ms. Wilson did not have

22   any role in that decision?

23           MS. MATTOX:  Object to the form.  Calls for

24      speculation.

25     A     There is no way that I could know that.  I

ACCURATE STENOTYPE REPORTERS, INC.

1    could only assume that they had to agree upon it.

2    BY MR. DERR:

3        Q    Do you believe that Ms. Wilson was retaliating

4    against you for any reports that you made to Derick

5    Daniel about Mr. Kranert?

6        A    Ms. Wilson?

7        Q    Yes, ma'am.

8        A    No, I wouldn't have any reason to believe

9    that.

10        Q    Do you believe Ms. Wilson was retaliating

11    against you for any reason?

12        A    I wouldn't have any reason to believe that she

13    was -- Yes.  For my letter to the Governor.

14        Q    And what race is Ms. Wilson?

15        A    She is African-American.

16        Q    Did you ever have an employee complain about

17    trying to get telecommuting privileges but being unable

18    to get them from you?

19        A    In all honesty maybe.

20            MS. MATTOX:  Don't speculate, though.  If you

21        don't know then don't speculate.

22        A    I don't recall.

23    BY MR. DERR:

24        Q    You don't recall anything like that?  How many

25    of your employees were telecommuting?

ACCURATE STENOTYPE REPORTERS, INC.