**7.    Excerpts from 6/7/13 deposition of Michelle Wilson**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO: 4:12-CV-00426-WS-CAS

SYLVIA BARGE.

    Plaintiff,

v.

FLORIDA COMMISSION ON HUMAN RELATIONS and
LARRY KRANERT, Individually,

    Defendants.
_____/

COPY

| | |
|---|---|
| DEPOSITION OF: | MICHELLE WILSON |
| TAKEN AT INSTANCE OF: | The Plaintiff |
| DATE: | June 7, 2013 |
| TIME: | Commenced at 11:36 a.m.<br>Concluded at 12:50 p.m. |
| LOCATION: | Accurate Stenotype Reporters, Inc.<br>2894 Remington Green Lane<br>Tallahassee, Florida 32308 |
| REPORTED BY: | AUTUMN R. KESTERSON<br>Registered Professional Reporter<br>Florida Professional Reporter<br><br>autumn.kesterson@aol.com<br>Certified Court Reporter |

ACCURATE STENOTYPE REPORTERS, INC.
2894-A REMINGTON GREEN LANE
TALLAHASSEE, FL 32308
850.878.2221/asreporters@nettally.com

```
 1  answer the question.
 2      A.  It's on record.
 3      Q.  No, ma'am.  Okay.  We're going to get the judge
 4  right now.  Okay?  I want you to go ahead and tell me
 5  right now --
 6          MS. MATTOX:  Do you want to go talk to her?
 7      Because I'm entitled to ask the question again and
 8      we're not going to do it this way.
 9          MS. BARCLAY:  Let's take a quick break.
10          THE WITNESS:  Okay.
11          (Break.)
12  BY MS. MATTOX:
13      Q.  Let's walk-through each one of the things that
14  you claimed that Ms. Barge did wrong that resulted in her
15  being fired?
16      A.  She did not train her employees.
17      Q.  Okay.  Which employees?
18      A.  Kimberly Bellamy.
19      Q.  And you don't have any personal knowledge as to
20  whether she trained them or did not train them?
21          MS. BARCLAY:  Form.
22          THE WITNESS:  Other than the fact that they told
23      me they were not trained.
24  BY MS. MATTOX:
25      Q.  Okay.  So, Kimberly Bellamy told you she had not
```

1  been trained?
2      A.   She was not trained.  She did not do the work.
3  And as a result, we even had to demote her back to do the
4  work and train her.
5      Q.   Okay.
6      A.   And once that happened, the work was completed.
7      Q.   Okay.  And Kimberly Bellamy.  Okay.
8      A.   Jeanie Williams.
9      Q.   Jeanie Williams.  Okay.  All right.  And what was
10 wrong with Ms. Williams -- or what did Ms. Williams do?
11     A.   Had no idea how to do archive records
12 appropriately, which caused a backlog and additional cost
13 related to storing those documents with the Department of
14 State at a time when we were trying to reduce those costs.
15     Q.   Okay.  What else?
16     A.   Copy records.  Copy requests.
17     Q.   Okay.  What about them?
18     A.   Tremendous backlog to the point of us getting
19 subpoenas.
20     Q.   Okay.  And that was Ms. Barge's fault?
21     A.   Correct.
22     Q.   She was the person who was responsible for that?
23     A.   Yes, she was.
24     Q.   That wasn't Mr. Kranert who was responsible for
25 the public records request?

1    THE WITNESS:  It was an open meeting.  So, I
2    don't know if her comments were, "Larry," and then she
3    continued with her comments.  I don't know if she was
4    making a statement directly to him or just making a
5    statement.
6  BY MS. MATTOX:
7    Q.  Okay.  Do you have any personal knowledge of any
8  of these things that you said resulted in Ms. Barge being
9  fired?  Do you have any personal knowledge of any of them?
10   A.  Yes, I helped work on them.  I helped clear up
11 the backlogs.
12   Q.  Okay.  The backlog on what?
13   A.  The 212s, the copy requests.  I did copy
14 requests.  I did the invoicing for a very long time.
15   Q.  Okay.  And who was responsible for copy requests,
16 the person who was actually responsible in Ms. Barge's
17 office?
18   A.  I don't recall who it was.
19   Q.  Okay.  And who was responsible for archiving?
20   A.  Jeanie Williams.
21   Q.  Okay.  And that wasn't Ms. Barge that was
22 responsible for that, though?
23       MS. BARCLAY:  Form.
24       THE WITNESS:  Ms. Barge is the supervisor.
25       MS. MATTOX:  No.  I understand.  But the person

```
 1      who was actually doing the archive requests, that was
 2      Jeanie Williams?
 3           THE WITNESS: Ms. Barge is the Records Management
 4      Liaison Officer and it is her job.
 5           MS. MATTOX: Okay. That's -- unfortunately, that
 6      wasn't my question. I was asking who was actually
 7      doing the archive requests, the archives?
 8           THE WITNESS: Nobody. Nobody was doing it.
 9      Ms. Barge was signing off on the disposition records
10      to have records destroyed.
11 BY MS. MATTOX:
12      Q.   Okay. Who was the person who was preparing the
13 documents inside the Florida Commission, was that
14 Ms. Williams?
15      A.   Which documents?
16      Q.   The archive requests, wasn't that Ms. Williams's
17 job?
18      A.   Archive requests?
19      Q.   Or the archive -- whatever documents pertained to
20 archives, wasn't that Ms. Williams's?
21      A.   There were several documents. Ms. Williams might
22 have been preparing some, but Ms. Barge also prepared
23 some.
24      Q.   Okay.
25      A.   As a matter of fact, we found some that had not
```

```
1  Ms. Barge gave them though, do you?
2          MS. BARCLAY:  Object to form.
3          THE WITNESS:  Very minimal.
4  BY MS. MATTOX:
5      Q.  Okay.  Do you have personal knowledge as to what
6  training Ms. Barge gave them?
7      A.  Yes.
8      Q.  How?  Were you there to watch Ms. Barge, what she
9  was doing with these employees?
10     A.  Based on what was reported to me when I asked the
11 question of the employee, "What training had you
12 received?"
13     Q.  Okay.  Well, that's not personal knowledge.
14 Okay.  So, let's define what personal knowledge is.  It's
15 not what somebody has told you, it's what you have
16 observed the person do.
17     A.  Correct.
18     Q.  So, do you know how much training Ms. Barge gave
19 to Ms. Williams or to Ms. Bellamy?
20         MS. BARCLAY:  Form.
21         THE WITNESS:  Very minimal.
22 BY MS. MATTOX:
23     Q.  Okay.  You watched was Ms. Barge did everyday in
24 her job?
25     A.  No.  I did the job that wasn't done by her
```

```
 1  employees.
 2      Q.   Okay.  So, do you know what training, again,
 3  Ms. Barge gave to Ms. Bellamy or to Ms. Williams?
 4           MR. REYNOLDS:  Object to form.
 5           THE WITNESS:  Very minimal.
 6  BY MS. MATTOX:
 7      Q.   Okay.  Well, were you watching what Ms. Barge
 8  did?
 9      A.   No.
10      Q.   Okay.  So, you don't know, do you?
11           MS. BARCLAY:  Object to form.
12           THE WITNESS:  Yes.
13           MS. MATTOX:  No, you don't.
14           MS. BARCLAY:  Object to form.
15           MR. REYNOLDS:  Object to form.
16  BY MS. MATTOX:
17      Q.   Ma'am, how much time did spend in Ms. Barge's
18  office everyday?
19      A.   Very little.
20      Q.   Okay.  So, do you know what she did everyday?
21      A.   I know what she was supposed to have been doing
22  everyday.
23      Q.   Do you know what she did everyday?
24      A.   No.
25      Q.   Okay.  And do you know what Ms. Williams and
```

1    MS. BARCLAY: Move to strike.
2    THE WITNESS: That is correct.
3    BY MS. MATTOX:
4    Q. Okay. What else?
5    A. What else -- what else what?
6    Q. Was there anything else that she did that you --
7    that resulted in her being fired?
8    MR. REYNOLDS: Object to form.
9    THE WITNESS: That I can remember off the top of
10   my head at the moment, the fact that we had a
11   tremendous backlog with those deferrals and 212s,
12   cases were not investigated that should have been
13   investigated by the Commission on Human Relations.
14   BY MS. MATTOX:
15   Q. That was in the 212s, these embedded 212 forms?
16   A. Right. The archives records were severely behind
17   and abandoned, which also caused us to forfeit savings
18   that could have been afforded to the Commission on Human
19   Relations for making sure those records were not kept at
20   the Department of State longer than they actually had to
21   have been kept.
22   Q. Okay. How many employees were under Ms. Barge's
23   supervision?
24   A. I don't know off the top of my head.
25   Q. Okay. Twenty, 25?

1     Q.   Was it Larry Kranert?

2     A.   No.

3     Q.   Thank you.  Now, the determination of Ms. Barge,
4  did it proceed along the same lines as this
5  reorganization?

6     A.   I don't understand your question.

7     Q.   Well, with the reorganization, Larry Kranert had
8  to make a recommendation and you had to approve it due to
9  the codirectorship that you two were in at the moment at
10 that time; correct?

11    A.   Correct.

12    Q.   Was that the same way that the termination played
13 out, he had to make a recommendation and you had to
14 approve it?

15    A.   Correct.

16    Q.   So, Larry Kranert was not the sole decision-maker
17 with regard to the termination of Ms. Barge?

18         MS. MATTOX:  Object to the form.

19         MR. REYNOLDS:  What's your objection.

20         MS. MATTOX:  Let me hear the question again.

21         (A portion of the record was read.)

22         MS. MATTOX:  Vague.

23 BY MR. REYNOLDS:

24    Q.   Was Larry Kranert the sole decision-maker in the
25 decision to terminate Ms. Barge?

ACCURATE STENOTYPE REPORTERS, INC.

```
 1        A.    No.
 2        Q.    Had Larry Kranert not requested that Ms. Barge be
 3   terminated, would you have ultimately come to the same
 4   conclusion due to what you've testified today as to her
 5   work product that termination was required?
 6             MS. MATTOX:  Object to the form.  Calls for
 7        speculation.
 8             THE WITNESS:  Yes.
 9             MR. REYNOLDS:  Thank you.  No further questions.
10             MS. BARCLAY:  No questions.
11                      REDIRECT EXAMINATION
12   BY MS. MATTOX:
13        Q.    Okay.  Larry Kranert was the person who came to
14   you to ask that Ms. Barge be fired, was he not?
15        A.    I don't know if it happened that way.
16        Q.    Well, he was the mover and shaker.  He was
17   behind -- he initiated the discussions about her
18   termination, was he not?
19             MR. REYNOLDS:  Form.
20             MS. BARCLAY:  Join.
21             THE WITNESS:  I don't know even know if that's
22        the case.  I believe it was a joint -- it was a
23        conversation.  It was a joint conversation.
24             MS. MATTOX:  Okay.  Where he is --
25             THE WITNESS:  It was a discussion.
```

```
 1  BY MS. MATTOX:
 2      Q.   Where he asked for her to be fired though, did he
 3  not?
 4      A.   He might have made the recommendation.
 5      Q.   Okay.  And he would certainly have known the
 6  reasons that he was making that recommendation; right?
 7           MS. BARCLAY:  Form.
 8           MR. REYNOLDS:  Join.
 9           THE WITNESS:  Yes.
10  BY MS. MATTOX:
11      Q.   Okay.  So, if he testifies that or has testified
12  that he doesn't have any idea why she was fired that
13  wouldn't be true, would it?
14      A.   I can't --
15           MR. REYNOLDS:  Objection.
16           THE WITNESS:  -- speak to his testimony on what he
17      says.
18  BY MS. MATTOX:
19      Q.   Because your testimony is that he was the person
20  who had talked to you about firing her and he may have
21  been the one who made the recommendation to fire her;
22  right?
23      A.   That is my testimony.
24           MS. MATTOX:  Nothing further.
25           MR. REYNOLDS:  I have nothing.
```