UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


CASE NO:   4:12-cv-00426-WS-CAS


SYLVIA BARGE,

        Plaintiff,

vs.

FLORIDA COMMISSION ON HUMAN
RELATIONS and LARRY KRANERT,
individually,

        Defendants.
_____/




DEPOSITION OF:              Sylvia Barge

TAKEN AT THE INSTANCE OF:   Defendants

DATE:                       Wednesday, May 8, 2013

TIME:                       Commenced at 9:15 a.m.
                            Concluded at 4:32 p.m.

LOCATION:                   2894 Remington Green Lane
                            Tallahassee, Florida

REPORTED BY:                Kimberly S. Bartholomew
                            Court Reporter


ACCURATE STENOTYPE REPORTERS, INC.
2894-A REMINGTON GREEN LANE
TALLAHASSEE, FLORIDA 32308    (850)878-2221

APPEARANCES:


        REPRESENTING PLAINTIFF:


    MARIE A. MATTOX, P.A.
    BY:  MARIE A. MATTOX, ESQUIRE
    310 East Bradford Road
    Tallahassee, Florida 32303


        REPRESENTING DEFENDANTS:


    SNIFFEN & SPELLMAN, P.A.
    BY:  MICHAEL SPELLMAN, ESQUIRE
    123 North Monroe Street
    Tallahassee, Florida 32301


    QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
    BY:  JOHN S. DERR, ESQUIRE
    215 South Monroe Street, Suite 600
    Tallahassee, Florida 32301

1                         I N D E X

2       WITNESS                                        PAGE

3       Sylvia Barge

4          Direct Examination by Michael Spellman         5

5          Cross Examination by John Derr               156

6          Cross Examination by Marie Mattox            210

7          Redirect Examination by Michael Spellman     223

8          Recross Examination by John Derr             225

9

10                      INDEX OF EXHIBITS

11      PLAINTIFF'S            DESCRIPTION                PAGE

12      None

13

14      DEFENDANT'S           DESCRIPTION                PAGE

15      Exhibit 1             Position Description          42

16      Exhibit 2             Manager's Accountabilities    44

17      Exhibit 3             Email/Performance Expectations  47

18      Exhibit 4             Email/Backlog                 49

19      Exhibit 5             Email                         96

20      Exhibit 6             Email/Letter to Governor Scott 108

21      Exhibit 7             Letter dated 9-1-11          113

22      Exhibit 8             Letter dated 10-7-11         116

23      Exhibit 9             Answers to Interrogatories   142

24      Exhibit 10            Interrogatories              170

25      Exhibit 11            Answers to Interrogatories   170

| 1 | Exhibit 12 | Emails | 185 |
| 2 | Exhibit 13 | Emails | 188 |
| 3 | Exhibit 14 | Emails | 189 |
| 4 | Exhibit 15 | Emails | 192 |
| 5 | Exhibit 16 | Emails | 193 |
| 6 | Exhibit 17 | Emails | 195 |
| 7 | Exhibit 18 | Emails | 196 |
| 8 | Exhibit 19 | Emails | 196 |
| 9 | Exhibit 20 | Letter to Erika Juwara | 205 |
| 10 | Exhibit 21 | Emails | 199 |
| 11 | Exhibit 22 | Emails | 199 |
| 12 | Exhibit 23 | Emails | 201 |
| 13 | Exhibit 24 | Telecommuting Agreement | 206 |

14

15

16

17

18

19

20

21

| 22 | CERTIFICATE OF OATH | 236 |
| 23 | CERTIFICATE OF REPORTER | 237 |
| 24 | ERRATA SHEET | 238 |

25

1       Q    Okay.  And do you reside there with anyone
2  else?
3       A    My two daughters.
4       Q    Okay.  And are they grown or are they under
5  18?
6       A    Oh, well, they are grown I guess for legal
7  purposes.
8       Q    Understood.
9       A    They are over 18.
10      Q    Okay.  Understood.  What is your age, ma'am?
11      A    Fifty-one.
12      Q    Okay.  Are you currently married?
13      A    No, sir.
14      Q    Have you ever been married?
15      A    No, sir.
16      Q    Okay.  Let me ask you about your educational
17  background.  Where did you go to high school?
18      A    Walton Senior High School, DeFuniak Springs.
19      Q    And you graduated from there?
20      A    Yes, I did.
21      Q    When did you graduate from there?
22      A    1979.
23      Q    Okay.  You attended college?
24      A    Yes, I did.
25      Q    Which colleges?

1        A      Employment investigations.

2        Q      Okay.  When did you take that course?

3        A      I took that class when I first started working

4   for FCHR.  And I previously worked for -- I previously

5   worked for FCHR in the '80s and so I had been trained

6   previously by EEOC.

7        Q      Okay.  Let me stick with the one when you

8   first started working at FCHR.  I will jump ahead just a

9   little bit here.

10              Your initial hire date at the Commission was

11   when?

12       A      Excuse me?

13       Q      When were you first hired by the Commission?

14       A      July, 2008.

15       Q      Okay.  And so sometime after July, 2008 you

16   took a course on employment investigations that was put

17   on by the EEOC; is that correct?

18       A      Correct.

19       Q      Okay.  Do you remember when exactly in 2008?

20       A      If I'm not mistaken it was in October of 2008.

21       Q      Okay.  And where was that training held?

22       A      New Orleans.

23       Q      Okay.  And is that a course that was sponsored

24   by -- Well, strike that.

25              How was your training and travel paid for to

```
1        Q     Is it fair to say that when you became the
2   administrator you didn't do anymore internal
3   investigations?
4        A     No, I did not.
5        Q     Okay.  Now, prior to working with the FDOT
6   where were you employed?
7        A     The Florida Commission on Human Relations.
8        Q     Okay.  And what was your position there?
9        A     I was an investigator.
10        Q     Okay.  And did you investigate employment
11   matters?
12        A     I did employment and housing.
13        Q     Okay, you did both.  And for how long, really
14   a number of years, I wouldn't expect you to know month
15   and year, if you do that's fine, but for how long did
16   you work for the Commission originally?
17        A     I believe I started working for the Commission
18   in 1986.
19        Q     Okay.
20        A     And I left in 1989.
21        Q     Okay.  Why did you leave?
22        A     I was a fast close investigator at that time
23   with the Florida Commission on Human Relations, that is
24   something that they no longer do, but it's where you go
25   out into the state, my area was Tampa, and I did on site
```

1    investigations where I had all the parties come in,

2    mediations basically, for a week at a time.  One week

3    out of every month.  And I had a small child and I just

4    didn't want to travel like that so I seeked other

5    employment.

6         Q    Okay.  Let me concentrate on your employment

7    with the Commission beginning in 2008.

8              Okay.  When you started back with the

9    Commission in 2008 you came in in what position?

10        A    I came in as the investigations manager.

11        Q    Okay.  And who did you replace, if you know?

12        A    Two individuals.

13        Q    Okay.  Who are they?

14        A    DeDe McGee, and I'm seeing his face but I

15   can't remember his name.  It will probably come to me

16   later but.

17        Q    And who was the executive director at the

18   time?

19        A    Derick Daniel.

20        Q    Do you know the circumstances why the two

21   positions or these two persons I should say were being

22   replaced by you?

23        A    Well, from what I understand is that there was

24   a backlog and I guess Derick just wasn't pleased with

25   the job and he decided that he wanted to hire someone,

```
 1        Q    All right.  Fair enough.  And so once you took
 2   over as the employment investigation manager, your
 3   investigator specialists, they would get a case
 4   assigned, they would investigate the case, they would
 5   draft an investigative memorandum.  It would go through
 6   you.  Then you would forward to legal or you would send
 7   it back to the investigative specialist and they send it
 8   to legal?
 9        A    I would send it -- I would review it.  I
10   reviewed every investigative memorandum that every
11   investigator wrote.
12        Q    Okay.
13        A    I would review it, and if there was something
14   in the investigative memorandum that I had concern with
15   I would send it back to the investigator.  But if I
16   approved it I sent it to legal.
17        Q    All right.  How many investigative specialists
18   were there under your supervision when you first became
19   the manager?
20        A    When I first became, if I'm not mistaken I
21   believe 17.
22        Q    Okay.  And at the time of your termination how
23   many investigative specialists were under?
24        A    That changed.  When I started or -- Can I
25   explain something to you?
```

1      Q     Sure.  Absolutely.

2      A     I started out as the investigations manager in

3    2008, I had 17 investigators.  By April of 2009 I had

4    taken on the intake process and there I inherited I

5    believe three other investigators.

6      Q     Okay.

7      A     And additional clerical staff.

8      Q     So there were actually investigators in the

9    intake and customer service as well as employment?

10     A     Yes.

11     Q     When you assumed the duties of the intake and

12   customer service did the investigators who had been

13   under customer service and intake continue to do

14   customer service and intake responsibilities, or did

15   they lead over to employment?

16     A     They continued to do customer service and

17   intake responsibilities.

18     Q     Okay.  So let me ask it again.  And I

19   appreciate that clarification.

20          At the time that you left the Commission how

21   many investigators were there in the employment, under

22   the employment umbrella?

23     A     I can't recall exactly how many, but I'm going

24   to make a guess and say probably about 14.

25     Q     Okay.  And the same question with respect to

ACCURATE STENOTYPE REPORTERS, INC.

1    customer service and intake.  If I understood your

2    testimony, and correct me if I'm wrong, but when you

3    assumed those responsibilities you inherited three new

4    investigators, and then there was also staff, but three

5    investigators.

6            At the time that you left the Commission how

7    many investigators were there in that customer service?

8        A    Two.

9        Q    Okay.  Tell me what the circumstances were

10   that led to your assuming the additional duties for

11   customer service and intake?

12       A    The manager who was previously an employment

13   investigation supervisor became the intake manager,

14   whenever I came in she left.

15       Q    Is that Ms. McGee?

16       A    McGee.

17       Q    Okay.  So McGee -- I'm sorry, go ahead.

18       A    So Derick asked me would I take it on, and for

19   the good of the agency because we were financially

20   strapped and he didn't want to layoff employees and I

21   agreed to do it.

22       Q    So Mr. Daniel approached you?

23       A    Yes.

24       Q    There was not an open competition --

25       A    No.

```
 1   most recent copy which would be this one.

 2        Q    Right.  Okay.

 3        A    But there was only a short time span that I

 4   was not the intake manager.  From the time that I was

 5   hired in July I believe I took those duties over in

 6   April of the following year.

 7        Q    So less than a year?

 8        A    So less than a year.

 9        Q    Okay.  Do you remember what the probationary

10   track was at the time you were hired in July of 2008?

11        A    What was the what?

12        Q    Probationary employment track.  Some people

13   are on probation for 90 days.  Do you remember if there

14   even was one at the Commission?

15        A    I don't even remember it being discussed a

16   probationary period.

17        Q    Okay.

18        A    I know as a state employee there is always one

19   and it is usually six months.

20            (Defendant's Exhibit 2 was marked for

21        identification.)

22   BY MR. SPELLMAN:

23        Q    Okay.  I will show you another document that I

24   have identified as Exhibit 2 to your deposition.  I will

25   ask you if you recognize this document?
```

ACCURATE STENOTYPE REPORTERS, INC.

```
1        A      I would think it probably was more like -- it
2   was after I took over intake.
3        Q      Right.  Was Derick still there?
4        A      Derick was still there.
5        Q      Okay.  Do you know of any source that could be
6   determined when legal made that announcement?
7        A      Well, we had -- all of the meetings were
8   recorded.  I can only say that unless you depose some of
9   the other managers in the meeting to recall if they
10  actually heard that too.
11       Q      Okay.
12       A      That would probably be the best way because I
13  can't give you a time frame unless you want to listen to
14  every recorded meeting which I don't think you would.
15       Q      Do you remember who made that announcement?
16       A      The general counsel.
17       Q      Mr. Kranert?
18       A      Yes.
19       Q      Okay.  Tell me about the additional duties
20  that you assumed when you took over the customer service
21  and intake unit?
22       A      When I took over the customer service, intake
23  unit I not only took over the process and the approval
24  of bringing -- intaking complaints, I also took over
25  customer service which included the mail, the telephone
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1   and copy requests.  It also included records management

 2   as far as being responsible for making sure that records

 3   that we had stored at the state location was destroyed

 4   in a timely fashion once they reached their age for

 5   destruction.

 6       Q    Okay.

 7       A    It also included me being the Governor's

 8   liaison for the office which required me to report to

 9   the Governor's office weekly the status of any

10   complaints or requests that they had made to our office.

11       Q    Now, what do you mean by the status of

12   complaints?  Overall or specific complaints?

13       A    Specific complaints that came from the

14   Governor's office.  Say, for example, if someone makes a

15   complaint to the Governor's office and the Governor's

16   office determines that is something that should come to

17   our office they then would refer it to our office for a

18   response.

19            Or if it was about our office they would send

20   it to us and I would be responsible for making sure that

21   it got to the right person for the correct answer, and

22   then follow up with that person to find out what the

23   status of it was.  And I would report it back to the

24   Governor's office as to what the status of that was,

25   whatever it may be.
```

ACCURATE STENOTYPE REPORTERS, INC.

1   for customer service and intake included the process and

2   approval of intaking complaints?

3        A    (Witness nods head.)

4        Q    Overseeing the mail, phone and copy requests?

5        A    (Witness nods head.)

6        Q    Records management including I guess

7   communication with I guess state archives on what can be

8   destroyed?

9        A    Right.

10       Q    Okay.  The liaison to the Governor's office.

11            What other additional duties have you not told

12   me about?

13       A    All right.  We had a deferral clerk who

14   brought the complaints that were being investigated by

15   EEOC, that was part of our responsibility also, to have

16   those documents scanned and recorded into our computer

17   system.

18       Q    Okay.

19       A    There is a record of that case being dual

20   filed with the Commission.

21       Q    Okay.  What other responsibilities?

22       A    At this time I can't recall.  But, I mean,

23   whatever needed to be done I basically did it, I mean.

24       Q    I know I asked you about those emails that had

25   like performance expectations, and we've talked about

```
 1    that time, it hasn't been moved to a different unit?

 2        A     It's still in intake.

 3        Q     Okay.

 4        A     But once that's done, once all that process is

 5    completed then it goes to investigations.

 6        Q     And investigations means either employment or

 7    housing or whatever it falls under?

 8        A     Just employment or whistle blower.  I didn't

 9    do housing intake.

10        Q     Oh, okay.  So the intake for housing is a

11    different unit?

12        A     They are a whole different section.

13        Q     Okay.  All right.

14        A     It's a whole different process.

15        Q     Got you.  Now, in talking about this EEOC and

16    FCHR -- I guess I'm moving over to the employment unit

17    now, but -- Well, maybe not.

18              But there is a work share agreement, you

19    always hear about a work share agreement.

20        A     Correct.

21        Q     What is your understanding of what this work

22    share agreement is?

23        A     The work share agreement is that the EOC will

24    pay the FCHR to investigate an agreed upon number of

25    complaints that are also filed under the federal law.
```

```
 1   it's never put into our case management system.  It's
 2   put into a separate system.
 3        Q    Okay.
 4        A    Or it was put into a separate system.
 5        Q    What system was it put into?
 6        A    To be perfectly honest with you I don't
 7   understand what that system was.  It was a drive, I want
 8   to say like a K drive, and they were all scanned into a
 9   particular drive on the computer.
10        Q    Okay.  When the EEOC does send you a case is
11   that a referral?
12        A    When they send us a case for investigation
13   that's a referral.
14        Q    Okay.  So that's the difference between a
15   referral and a deferral?
16        A    Correct.
17        Q    Okay.  And does the Commission to your
18   knowledge -- Did the Commission have any say so when the
19   EEOC decided to defer a case?
20        A    No.  We don't know literally, and I am telling
21   you literally, we would get deferrals in by the hundreds
22   a week.
23        Q    With no explanation, just --
24        A    Well, we just know, you know, it comes in the
25   package, it's a deferral.  We know it's a deferral, it
```

ACCURATE STENOTYPE REPORTERS, INC.

1  goes to the deferral clerk.  There were so many of them,

2  you know, then she scans them in so we have a record

3  that we had them.  And then if EEOC contacted us or an

4  attorney contacted us to see if we had the case we could

5  look to say, yes, we have a record of the case, it's

6  scanned in.

7          So then we would print it, certify it, and

8  send it to EEOC if they needed it; or, we would send it

9  to the attorney or whoever requested it as to certify

10 that, yes, this case was dual filed with the FCHR.

11         That's how we did it under my leadership and

12 from what I understand how it was done prior to me

13 coming there.

14    Q    But explain to me, how was it dual filed on a

15 deferral?  Because I thought I understand it wasn't

16 given a case number and it was managed under a different

17 system so.

18    A    Because then whenever we would certify it, it

19 is certified and stamped with the executive director's

20 signature.

21         And I can't say for certain because I'm not

22 looking at one, but I think there was some language on

23 it in the whole form that they send because it's more

24 than just a copy of the complaint, there is some type of

25 a notification that's attached.  And I think that that

1      A     Okay.  But Mobile really wasn't required to

2   send us those cases because we didn't have a work share

3   agreement with Mobile, with that district.

4      Q     Do you recall the number of cases the

5   Commission was required -- You had mentioned under the

6   work share agreement there is a number that's agreed

7   upon.  Do you recall what that number was in the fiscal

8   year from October of 2010 to September of 2011?

9      A     I don't recall exactly what the number was in

10   the contract.  I don't recall what it was.  Usually,

11   though, I can tell you from past experience it's over

12   800, close to 900.  Maybe sometimes a little over 900.

13      Q     Do you know if these agreements are entered

14   into each year?  I mean, is the number --

15      A     They are entered into each year.

16      Q     And what role did you play in your management

17   capacity with respect to determining whether that number

18   should go up or go down?  Were there meetings, were

19   there emails?  What do you recall about that?

20      A     I would be asked if I thought that I could

21   handle an upward modification, and if I felt like I

22   could handle an upward modification I would say so.

23           And in the years that I worked for FCHR,

24   excluding the year that I was terminated, we always had

25   an upward modification.

ACCURATE STENOTYPE REPORTERS, INC.

1    new intake supervisor and he wasn't quite clear on the

2    process of referrals and he wasn't referring cases to

3    us.

4         Q     Okay.

5         A     So once I found out that he wasn't referring

6    cases to us I picked a reasonable time frame where the

7    cases would be months to go back through to look through

8    the deferrals to find cases that would have been in our

9    jurisdiction that we could take.  And if the cases

10   weren't too old for us to absorb them from EEOC I made a

11   listing of those cases and worked with EEOC to send us

12   those cases that were not too old.

13              Because if they were too old there was not

14   much we could do with them because they were going to go

15   over, it wouldn't pay for us to do something that EEOC

16   has almost completed.

17              So I went through the deferrals and I found a

18   number of cases that we could have taken in as a

19   referral had they been referred to us.

20        Q     Okay.  But for some unexplained reason they

21   were deferrals instead of referrals?

22        A     Exactly.

23        Q     And so you were pointing out to EEOC these

24   could have been referrals, we can take them on, let us

25   take them on?

ACCURATE  STENOTYPE  REPORTERS,  INC.

```
 1   relationship between the Florida Commission and the

 2   EEOC?

 3       A    Particulars forms?

 4       Q    Yeah.  Do you remember any particular EEOC

 5   forms, form number this or form number that that dealt

 6   with these?

 7       A    Oh, yes.  We regularly referred to forms by a

 8   number.

 9       Q    Okay.  So what are some of the forms that you

10   recall?

11       A    I can't recall the numbers but we regularly

12   referred to them.  I want to say 213 or 231.

13       Q    Is it 212, is that one?

14       A    212, that's it.

15       Q    I have seen two different ones, I've seen one

16   called I think a 22-L or something like that.  That may

17   not be an EEOC form.

18            Let me ask you about the EEOC --

19       A    212.

20       Q    -- 212 form.  What is that?  What is your

21   understanding?

22       A    If I'm not mistaken, and I'm not looking at

23   it, the 212 is the form that EEOC sends to us that is

24   attached to the deferral.

25            It's been a while, I haven't done it in a
```

 1    while, and I can't be certain.  But if you would show it

 2    to me I could tell you what it is.

 3        Q    I don't have one.  I just have read about them

 4    and I have absolutely no understanding of them.

 5        A    I believe that that's the form.  Remember that

 6    we discussed that you would certify that we received the

 7    charge, I believe that's the 212.

 8        Q    Okay.  Was it your responsibility or part of

 9    your responsibility as the manager of employment

10    investigations to review the 212 forms?

11        A    It was my responsibility to make sure that

12    those forms were -- it was my understanding that my

13    responsibility was to make sure that those forms were

14    scanned in a reasonable length of time and documented

15    that we had received it.

16            But as far as being able to review hundreds of

17    deferrals, it just wasn't humanly possible for me to do.

18    There was just no way I could have done that.

19        Q    Now, you mentioned that it was your

20    understanding they had to be scanned within a reasonable

21    time.  Can you tell me what that means, what a

22    reasonable time is?  What your understanding of it was.

23        A    How do I explain this?  Deferrals, not that

24    they weren't important, but in the scheme of the things

25    that I had to accomplish as manager of both those units

1   it was probably my least priority because if it wasn't

2   scanned in we could still find it if it was sent to us

3   and we could certify it and get it to whoever requested

4   it.

5          The position that was a deferral clerk, not

6   only did they scan the deferrals, they had other

7   responsibilities, too.

8          And at that particular time during my tenure

9   there as the investigations manager, I had a deferral

10  clerk work as an assistant to an investigator who was

11  sight impaired, was blind.

12      Q    Okay.

13      A    Okay.  So she spent part of her time working

14  with that investigator, scanning her documents, reading

15  documents to her that couldn't be converted into Braille

16  and doing those things that she couldn't do for herself.

17      Q    Okay.

18      A    We tried to keep it up as best we could.  But

19  not only that, the position was constantly over -- there

20  was turn over in the position as well as just the sheer

21  number that you got in on a weekly basis.

22      Q    Okay.  So it sounds like was there -- are you

23  saying that there was a backlog of these EEOC 212 forms?

24      A    I wouldn't call it a backlog.

25      Q    Okay.

1    it.

2        Q    Okay.

3        A    Shortly thereafter I was told this and then

4    prior to my being terminated I was removed as the intake

5    manager.

6        Q    Do you know if as a part of the response to

7    the EEOC 212 form the Florida Commission on Human

8    Relations could request the jurisdiction be transferred

9    from the EEOC to the Florida Commission on Human

10   Relations?

11       A    Not to my knowledge just by the 212 form.  We

12   did it regularly on a regular basis, though, just

13   through verbal communication with the intake manager of

14   either Miami or EEOC, or the work share coordinator.

15       Q    Now, the work share coordinator, that's

16   somebody different.  Is that Ozzie Black?

17       A    No, that is Ina Depass (phonetic).

18       Q    Okay.

19       A    Or was Ina Depass.

20       Q    Out of the Miami office as well?

21       A    Out of the Miami office.

22       Q    What was Ozzie Black's role?

23       A    Ozzie, I'm not exactly sure if he is assistant

24   director or something of that nature.  I'm not exactly

25   sure what his role is.  I just know that that's who

```
 1   identifying as Exhibit 5 to your deposition.
 2             (Defendant's Exhibit 5 was marked for
 3        identification.)
 4   BY MR. SPELLMAN:
 5        Q    Do you recall this document?
 6        A    Yes, I do.
 7        Q    Okay.  And can you tell me what were the
 8   circumstances that were behind your writing this email?
 9        A    Derick asked the managers to give him our
10   observations about issues that we were complaining about
11   Larry.
12        Q    Do you know why at this particular snapshot in
13   time in November of 2010 Mr. Daniel requested this
14   input?
15        A    Yes, I do.
16        Q    Okay.  Can you tell me what that is?
17        A    One of my investigators came to me highly
18   upset and was complaining that Mr. Kranert had made some
19   very inappropriate comments regarding another
20   investigator after she approached a group of legal
21   employees and advised them of comments that they were
22   making about Christians she found offensive.
23        Q    Okay.  Now, the investigator that came to you
24   complaining, who was that?
25        A    Emily Davis.
```

1   Q    Okay.  And the comments that were directed at

2   another investigator, who was that investigator?

3   A    Alicia Maxwell.

4   Q    Okay.  And you, as I understand, did not hear

5   any of these comments?

6   A    No, I did not hear the conversation.

7   Q    Okay.  They came to you and related the

8   comments about religion.

9        And so what did you do as a result of that

10  investigator coming to you, Ms. Davis?

11  A    I notified Derick of the situation and he then

12  initiated an investigation.  That's how I understand it

13  happening.

14  Q    How did you notify Mr. Daniel?  Was it by

15  phone or in writing or in person?

16  A    I believe I sent him an email and said can you

17  call me because he wasn't in the office.  So I notified

18  him of the circumstances by phone.

19  Q    Okay.  What is the next thing that you -- what

20  is the next communication you had with Mr. Daniel

21  related to this incident that you recall?

22  A    I don't remember after my initial conversation

23  with Derick that we had a conversation about it at all.

24  Q    Okay.  And so how long after, to the best of

25  your knowledge, your telephone call with him did he

1    request and/or did you draft this email that's Exhibit

2    5?

3        A    I can't really be sure of the time frame.  But

4    I believe it was weeks if I'm not mistaken.

5        Q    Okay.  How were you informed that Mr. Daniel

6    wanted the managers to send him this information?  Was

7    it by email, was it in person, was it by phone?

8        A    I can't recall exactly how he made the

9    request.  I just recall him saying send it to my

10   personal email address.

11       Q    Did you ever have an understanding of why he

12   asked that specifically?

13       A    Excuse me?

14       Q    Did you ever have an understanding of why

15   Mr. Daniel asked that it be sent to his personal email

16   address?

17       A    I don't know why he requested that.

18       Q    Okay.  Other than this email that's in front

19   of you in Exhibit 5 did you send Mr. Daniel anything

20   else in response to his request?

21       A    No, I did not.

22       Q    Okay.  Did you share this email that you sent

23   to Mr. Daniel with anyone else?

24       A    In what time frame?

25       Q    At the time that you sent it.

1    A    No, I did not.

2    Q    How about prior to being terminated?

3    A    No, I did not.

4    Q    Okay.  Do you have any knowledge if Mr. Daniel

5 shared this email with anyone else?

6    A    No, I do not.

7    Q    You were aware of the policies and procedures

8 at the Commission as an employee, the handbook and

9 various other policies and procedures?

10         MS. MATTOX:  Object to the form.

11    A    Yes, I've been given them.

12 BY MR. SPELLMAN:

13    Q    Okay.  You knew that the Commission had a

14 grievance policy?

15         MS. MATTOX:  Object to the form.

16    A    Yes.

17 BY MR. SPELLMAN:

18    Q    Did you consider this to be a grievance?

19    A    No.

20    Q    This email is specifically your concerns --

21 I'm sorry, your observations about Mr. Kranert, correct?

22    A    Correct.

23    Q    Okay.  And you were seeking Mr. Daniel to

24 authorize an investigation; is that correct?

25    A    Could you clarify that?

1    Q    Okay.  Did you have any follow up discussions

2  with Mr. Daniel after you sent him this email?

3    A    No, I did not.

4    Q    Do you contend that as a result of this email

5  you were retaliated against?

6    A    No, I do not.

7    Q    Okay.  I should have asked that first.

8         What complaints did you make directly to

9  Mr. Kranert, if any, about discriminatory or harassing

10  behavior or statements?

11    A    Directly to Larry?

12    Q    Yes, ma'am.

13    A    None.

14    Q    What complaint did you make to Mr. Daniel on

15  your own behalf of discriminatory statements or actions

16  or harassing statements or actions by Mr. Kranert?

17    A    Is it appropriate for me to restate your

18  question to see if I understand what you are asking?

19    Q    It was a very poorly worded question.  You

20  certainly may.

21    A    Are you asking me did I as an individual say

22  to Derick Daniel that Mr. Kranert was discriminating

23  against me?

24    Q    Yes, ma'am.

25    A    No, I did not.

ACCURATE STENOTYPE REPORTERS, INC.

1    Q    Okay.  Did you ever complain to Mr. Daniel

2  that Mr. Kranert was harassing you on any protected

3  basis?

4    A    No, I did not.

5    Q    Okay.  Do you recall a meeting in July of

6  2011, probably a managers' meeting, but a meeting at the

7  Commission wherein Mr. Kranert made comments regarding

8  the age of the persons being hired at the Commission?

9    A    Yes, I do.

10    Q    What do you recall Mr. Kranert said

11  specifically at that meeting?

12    A    In general, I can't specifically quote him,

13  but in general he said that the Commission would no

14  longer be interested in hiring the 25 year veteran state

15  employees, that they were looking to hire younger

16  employees who maybe didn't have the experience but who

17  could be trained to do the job.

18    Q    And what else do you recall was said by anyone

19  including yourself at that meeting?

20    A    At that time the housing manager, Regina

21  Owens, said couldn't that be age discrimination.  And

22  Mr. Kranert became upset, I don't remember what exactly

23  he said, but it was he became upset and felt that she

24  was accusing him of age discrimination.

25         I tried to explain as the investigations

ACCURATE STENOTYPE REPORTERS, INC.

1   manager that although he is not being accused of age

2   discrimination those type comments can be perceived as

3   age discrimination if ever a situation arised where you

4   hired younger employees over someone who was more

5   experienced.

6        Q    Okay.  Anyone else that you remember chiming

7   in?

8        A    He became very upset and said that we were

9   accusing him of age discrimination and then out of the

10  blue he says what next, will it be race?  Which --

11       Q    Did anybody respond?

12       A    At that point I stopped talking.  I don't

13  think anybody else said anything.  And Mr. Kranert was

14  very upset and subsequently left the meeting.

15       Q    Did you ever have any opportunity to have a

16  follow up discussion or voice any concerns following

17  that meeting and before your termination?

18       A    About?

19       Q    About the issues that were raised in that

20  meeting.

21       A    No, I did not.

22       Q    Okay.  Did you meet with anyone prior to your

23  termination about Mr. Kranert's comments relating to the

24  age of the work force at the Commission?

25       A    Is it appropriate for me to restate your

ACCURATE STENOTYPE REPORTERS, INC.

1    question so that I will understand what you are asking

2    me?

3         Q    Give it a shot.

4         A    Did I talk to anyone about it or did I have a

5    formal meeting to discuss the issue?

6         Q    No.  Did you talk with anyone, that's fine.

7         A    Yes, we all talked about it because it was an

8    explosive meeting.

9         Q    Okay.  Who is all?

10         A    Particularly John Peck who was new and the

11   public information officer came to my office immediately

12   afterwards and it was just, you know, amazed.  And his

13   comment to me was even I know you don't say something

14   like that.

15              So we did discuss it among ourselves that it

16   was pretty outrageous.  But no formal meeting.

17         Q    Who else did you talk with about it?

18         A    Regina Owens.

19         Q    Okay.  Anyone else?

20         A    I believe that probably was the only two

21   people.

22         Q    Okay.  Do you contend that as a result of your

23   speaking in that meeting in July of 2011 you were

24   retaliated against?

25         A    No, I do not.

ACCURATE STENOTYPE REPORTERS, INC.

```
 1              (Defendant's Exhibit 6 was marked for

 2         identification.)

 3    BY MR. SPELLMAN:

 4         Q     Okay.  Ms. Barge, I'm going to show you a

 5    document that I identified as Exhibit 6 to your

 6    deposition.

 7              I would ask you to take a look at it, the

 8    first page, and then the letter that is attached several

 9    pages to it, five pages to it.

10              Are you ready?

11         A     Oh, yeah.  Did you ask me something specific?

12         Q     No, ma'am.  I was just letting you review it.

13    I wanted to make sure you were ready to go.

14              Tell me what these documents are.

15         A     This is a letter that I wrote to the

16    Governor's office about concerns that I had at the

17    Commission.

18         Q     Okay.  So it appears to me, and correct me if

19    I'm wrong, that the second page of this exhibit is the

20    actual letter to the Governor?

21         A     Yes.

22         Q     And it is dated August 14th, 2011, correct?

23         A     Correct.

24         Q     Okay.  Who drafted this letter?

25         A     I did.
```

```
 1    that's what you did, right?  I mean, this email seems to
 2    say in response to that conversation here is my letter.
 3         A    Yes.  I believe the conversation was they were
 4    looking into it trying to determine whether or not it
 5    was a whistle blower status.  And I probably responded,
 6    I'm pretty sure I did, I said if this does not reach
 7    whistle blower status please do not send this to the
 8    agency.  Because I was very concerned that once this
 9    went to FCHR that I probably would be fired.
10         Q    So it was a concern of yours to not have this
11    shared with the Commission on Human Relations?
12         A    Can I explain why I would say that?
13         Q    Well, can you answer that question first?
14         A    Yes.
15         Q    Was that your concern?
16         A    Right.
17         Q    Okay.  Now, go ahead.
18         A    The reason, because I as the Governor's
19    liaison, I know that most stuff they don't even see,
20    they don't read it.  They just see, oh, Florida
21    Commission on Human Relations so they send it to us.
22              So I'm usually the person who would get those
23    documents so that's why I specifically asked, no, please
24    don't do that because basically they just send them out.
25         Q    Okay.  Now, let me ask you.  When you first
```

```
1    emailed this letter to the Governor did you copy anyone
2    or share that email to the Governor with anyone?
3         A    I did.  I can't recall if it was when I sent
4    it to the Governor or after I sent it to the Governor.
5    I do know that I did inform Ms. Owens that I was writing
6    a letter to the Governor and so I don't know if I shared
7    this with her prior to me sending it or after.
8         Q    Okay.  Anyone other than Ms. Owens?
9         A    Only Ms. Owens.
10        Q    Okay.  And, likewise, the email that you have
11   here to the Chief Inspector General's Office, did you
12   share that or copy that with anyone?
13        A    No.
14        Q    Okay.
15        A    Not to my knowledge.
16        Q    Okay.  Let me show you what I'm identifying as
17   Exhibit 7.
18             (Defendant's Exhibit 7 was marked for
19        identification.)
20   BY MR. SPELLMAN:
21        Q    Do you recall receiving this letter?
22        A    Yes, I do.
23        Q    Okay.  Now, prior to receiving this letter did
24   you give any kind of a recorded statement or interview?
25        A    No, I did not.
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1        Q    Okay.  Did you furnish any documents to the
 2   Inspector General's Office?
 3        A    No, I did not.
 4        Q    Okay.  Other than the initial communication
 5   you had with them in sending the letter do you recall if
 6   you had any communication with the Chief Inspector
 7   General's Office between August 23rd and September 1st,
 8   2011?
 9        A    I do believe that I called them and informed
10   them that I had been terminated from my job on
11   August 29th, and I may have done that on that day.
12        Q    Okay.
13        A    And informed them of the reason I was given.
14        Q    Which was?
15        A    You are a select exempt employee.
16        Q    Okay.  So the only reason was because we can
17   because you are a select exempt employee?
18        A    Right.
19        Q    And you were a select exempt employee,
20   correct?
21        A    Yes, I was.
22        Q    Okay.  Now, do you know of any information or
23   any fact that anyone at the Florida Commission on Human
24   Relations knew that you had filed the complaint with the
25   Chief Inspector General's Office?
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1              MS. MATTOX:   Object to the form.
 2       A      Repeat the question.
 3  BY MR. SPELLMAN:
 4       Q      Okay.  Do you have any knowledge that anyone
 5  at the Florida Commission on Human Relations knew that
 6  you had filed a complaint with the Chief Inspector
 7  General's office prior to your termination?
 8       A      No, I do not.
 9       Q      Ultimately was the complaint lodged with the
10  Chief Inspector General's Office transferred to the
11  Department of Management Services Inspector General's
12  Office?
13       A      Yes, it was.
14       Q      Okay.  And do you remember who you dealt with
15  in that Inspector General's Office?
16       A      Tim Carlisle.
17       Q      And did you provide Mr. Carlisle with any
18  documents?
19       A      The letter.
20       Q      Okay.  Anything else?
21       A      No, I did not.
22       Q      Did you give any kind of an interview or
23  recorded statement?
24       A      Yes, I did.
25       Q      Okay.  And do you know what the outcome of
```

1    life, in general, make their life miserable, he would

2    make sure that no cases got through legal, he would send

3    every one back, he would go through them with a fine

4    tooth -- he made threats that were retaliatory.

5        Q    Okay.

6        A    Okay.  And I believe that that was part of

7    that led to maybe some of the other actions that led to

8    my determination -- led to my termination.

9        Q    Okay.  Do you know if Mr. Kranert ever learned

10   that you were the person that reported to Mr. Daniel?

11       A    I can't say for sure.

12       Q    Okay.  Do you know of any information that

13   would tend to support any contention that Mr. Kranert

14   knows or knew that you were the person that reported

15   him?

16            MS. MATTOX:  Object to the form.  Calls for a

17       legal conclusion.

18            You can go ahead and answer.

19            THE WITNESS:  Okay.

20       A    The fact that he was threatening the

21   employment investigations unit and threatening to send

22   all of our cases back would indicate that he was very

23   well aware.

24   BY MR. SPELLMAN:

25       Q    Okay.  Anything else?

ACCURATE STENOTYPE REPORTERS, INC.

```
 1              MS. MATTOX:  Object to the form.

 2       A     Not to my knowledge.

 3  BY MR. SPELLMAN:

 4       Q     Okay.  And other than what you've discussed or

 5  testified to already, are there any other reasons that

 6  you have not testified to that you contend were the

 7  basis behind any retaliation by the Commission?

 8              MS. MATTOX:  Object to the form.  Calls for a

 9       legal conclusion.

10              You can go ahead and answer.

11       A     None other than the ones that we've discussed.

12              MR. SPELLMAN:  Okay.  Off the record, please.

13              (A lunch break was taken off the record from

14       12:27 a.m. to 1:25 p.m.)

15  BY MR. SPELLMAN:

16       Q     Okay.  Are you ready?

17       A     Yes.

18       Q     All right.  First let me ask you, over the

19  break is there any answer that you gave before we took a

20  break that upon thinking about it more you would like to

21  change or add to?

22       A     Yes.  I would like to clarify one of my

23  answers.

24       Q     Okay.  Which one?

25       A     When we talked about the retaliation claim
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1    associated with the email that I wrote to Derick Daniel,

 2    it wasn't the email that prompted the retaliatory

 3    comments, it was the fact that I reported to Derick

 4    Daniel the comments that he made, the inappropriate

 5    comments that he made regarding the investigator that

 6    prompted the investigation.

 7         Q    So before you emailed Mr. Daniel the exhibit

 8    we looked at --

 9         A    Right.

10         Q    -- I think you had testified that you emailed

11    him and said we need to take or call me or something

12    like that?

13         A    Right.  Whenever I got a complaint from one of

14    my investigators regarding the inappropriate comments

15    that Larry and some of his staff were making in the

16    hallway.

17         Q    Okay.  And then you emailed Mr. Daniel and you

18    said call me or let's talk, whatever, and then you spoke

19    on the phone I believe you said?

20         A    Right.

21         Q    And that's when you reported to him what

22    happened?

23         A    Exactly.

24         Q    Okay.  And that led to Jamilia Moran doing an

25    investigation?
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1        A     Correct.

 2        Q     Okay.  And so what you're saying is that

 3   reporting to Mr. Daniel is what was the impetus, it's

 4   what led to retaliation against you?

 5        A     Eventually.

 6        Q     Okay.  By whom?

 7        A     By Larry.

 8        Q     By Mr. Kranert.  And I think I asked you this

 9   earlier, but I want to just clarify it.

10             Do you know if Mr. Kranert knows that you

11   reported those -- that you had that telephone

12   conversation with Mr. Daniel?

13        A     I have the investigative notes from Ms. Moran

14   of the comments that he made during her interview of him

15   during the investigation.

16        Q     And what do they reflect?  What do those notes

17   reflect?

18        A     In those notes -- and she had also reported to

19   us because she was afraid verbally, we had become

20   concerned -- he made the comment that he would make sure

21   that no cases got through legal, he would go through

22   them with a fine tooth comb, he would send them back.

23   In other words, he would make it impossible for me to do

24   my job.

25        Q     Well, did he mention you specifically?
```

```
 1      A    He mentioned investigations, and I am the only

 2 investigations manager of whose cases he reviews.

 3      Q    Right.  But the report came out of a

 4 conversation with investigators you supervised in that

 5 unit, correct?

 6      A    Right.  But it was known that a manager

 7 reported it.

 8      Q    How was that known?  How do you know that?

 9      A    Well, I guess I'll take that back.  It was

10 assumed that he knew that a manager reported him.

11      Q    How do you know that it was assumed?

12      A    Based on the comments that he made.

13      Q    Specifically what comments are you --

14      A    Every case that came through legal he would go

15 through with a fine tooth comb, he would make sure that

16 our cases didn't go -- something to that effect.  I

17 can't say without looking at the document specifically,

18 but it was all -- Those comments would only adversely

19 affect one person, and that would be me.

20      Q    Okay.  Do you have any other knowledge that

21 Mr. Kranert knew that you had made the phone call to

22 Mr. Daniel about that incident?

23      A    No, I do not.

24      Q    Okay.  Other than that response that you

25 wanted to clarify, are there any others that upon
```

ACCURATE STENOTYPE REPORTERS, INC.

1    reflection you would want to clarify or change?

2         A    Can I speak with my attorney for a minute?

3         Q    Not with a question pending.

4         A    Not with a question pending.  I'm not certain.

5         Q    Okay.  Let me turn then to your discrimination

6    claims.

7         A    Okay.

8         Q    You know that you have filed a Complaint in

9    this case that alleges race and age discrimination,

10   correct?

11        A    Correct.

12        Q    Okay.  What actions did the Commission take or

13   fail to take that you contend were on the basis of your

14   race?

15        A    When I was given additional duties, when I

16   took over another section, I was told there was no money

17   available for pay increases.  When Mr. Daniel left a

18   younger white female was given additional duties we were

19   told and she received an $11,000 pay increase.

20        Q    Okay.  So one issue, one action is a pay

21   increase, correct?

22        A    Correct.

23        Q    Okay.

24        A    That's the age.

25        Q    That's age?

```
 1        A     And race.

 2        Q     Okay.  So both.  Any others for both?

 3        A     No, not for both.

 4        Q     Okay.  Any others for just race?

 5        A     Yes.  After I was terminated I was immediately

 6    replaced by a white female and subsequently she was

 7    replaced by a white male.  And to date all of the

 8    management staff, to my knowledge, other than one

 9    supervisory investigator are all white.

10        Q     Okay.  So --

11        A     Excluding the executive director, of course.

12        Q     So your claim is that you were terminated on

13    the basis of your race?  Is that what your claim is?  I

14    understand you're saying you were replaced by a white

15    female.

16        A     I believe that that was part of it.

17        Q     I'm sorry, that what was part of what?

18        A     The reason why I was terminated.

19        Q     Was in part due to your race?

20        A     Yes.

21        Q     Okay.  What was the other part?

22        A     Retaliation.

23        Q     Okay.  All right.  And we've talked about

24    that.

25              Is there any other action that the Commission
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1    took or failed to take which you contend was on the

 2    basis of your race?

 3         A    Other than the pay increase and my

 4    termination, no.

 5         Q    Okay.  And other than the pay increase is

 6    there any other action that the Commission took or

 7    failed to take which you contend was on the basis of

 8    your age?

 9         A    Other than the termination?

10         Q    I thought you said the termination was only

11    race, that race and age were the pay increase.

12         A    No.  I said age was the pay increase, but age

13    and race was the basis for my termination.  But age was

14    only dealing with the pay increase because a much

15    younger white female was given an $11,000 pay increase.

16         Q    I'm not sure, we're getting our signals

17    crossed.

18         A    Well, maybe I'm misunderstanding your question

19    or you're misunderstanding --

20         Q    So the actions that you contend are related to

21    your age are the pay increase, correct, because a

22    younger female received a pay increase?

23         A    Yes.

24         Q    Do you contend the termination was based on

25    your age?
```

```
 1        A     I believe it was.

 2        Q     Okay.  So both the pay increase and the

 3   termination you contend were on the basis at least in

 4   part of your race and your age?

 5        A     Can I explain something here?

 6             MS. MATTOX:  Just try to answer his question

 7        first.

 8        A     I believe that age was the basis for me not

 9   getting a pay increase.

10   BY MR. SPELLMAN:

11        Q     Okay.

12        A     Okay.  At the time I was terminated I believe

13   race was also a factor in the reason I was terminated

14   because I was subsequently replaced by all white

15   individuals.

16        Q     Okay.

17        A     Age, the pay increase.  Race, the termination.

18        Q     Okay.  So they are mutually exclusive?

19             MS. MATTOX:  Object to the form.

20        A     In my opinion, no.

21   BY MR. SPELLMAN:

22        Q     Okay.  Who replaced you?

23        A     Mary Haskins initially.

24        Q     Okay.  And for how long did she replace you?

25        A     I don't believe she was there a year.  I don't
```

1    think -- maybe six months.  I wasn't there, but that's

2    what I understand.

3         Q    Okay.  And do you know how old Mary Haskins

4    was at the time that she replaced you?

5         A    I don't know Mary's age.

6         Q    Okay.  Do you think she is older than you?

7         A    I believe that she is older than me.

8         Q    Okay.  Now, other than the fact that Mary

9    Haskins is white, do you have any other information or

10   facts that the decision to terminate you was based on

11   your race?

12            MS. MATTOX:  Object to the form.  Calls for

13        legal conclusion.

14        A    I believe because I was an effective employee

15   and that I had no complaints regarding my job

16   performance, the fact that I was terminated without a

17   reason being given to me and replaced by a white female

18   indicated to me that it was my race.

19   BY MR. SPELLMAN:

20        Q    Okay.  And upon what basis do you contend that

21   you had no complaints against you?

22        A    There was never any warnings or complaints

23   against my job performance the entire time that I was

24   there.

25        Q    And what do you contend or what can you point

1   to that substantiates your statement that you were an

2   effective employee?

3       A    The fact that I was, in the three years that I

4   was there, I managed probably 50 percent or close to

5   49 percent of the employees and all of the functions

6   associated with the Commission.

7            And during that time we were able to decrease

8   the backlog to one percent or less.  We were able to

9   accomplish all of the things that Mr. Daniel had

10  problems with that he told me was a priority for him.

11      Q    Do you contend that there were any managers

12  who were white who had complaints lodged against them

13  who were not terminated?  Do you know of any?

14      A    The general counsel from the day he walked in

15  the door had numerous complaints, internally and

16  externally.

17      Q    And how did you know that?  Other than the one

18  that you lodged or the email that I've shown you today,

19  what do you know about any complaints against

20  Mr. Kranert?

21      A    I received on occasion telephone calls from

22  individuals who were very upset about conversations they

23  had had with Mr. Kranert.  When I discussed with the

24  human resource manager inappropriate comments she

25  indicated that she had had numerous complaints against

ACCURATE STENOTYPE REPORTERS, INC.

1    Mr. Kranert and had expressed her concern to the

2    executive director.

3         Q    Other than Mr. Kranert do you know of any

4    other managers who were white who in spite of having

5    complaints were not fired?

6         A    None that I know of.  But I didn't work that

7    closely with the other -- Other than the human resource

8    director and Mr. Kranert, the other white individuals

9    worked remotely except for Brian Wilder after he came

10   aboard which was later in my employment.

11        Q    You're not aware of any complaints that were

12   lodged against Mr. Wilder?

13        A    Formal complaints or just -- I don't know of

14   any formal complaints that were lodged against him.

15        Q    Okay.  How about informal?

16        A    Informal we constantly complained about his

17   response to computer issues.

18        Q    And who is we?

19        A    Myself, other investigators, other managers.

20        Q    And to whom did you complain?

21        A    To Brian and in meetings to the best of my

22   knowledge.

23        Q    Okay.  And they were about response time?

24        A    Brian's response time?

25        Q    Yeah.  What were the complaints about?

1    A    Our computers were constantly down.  Brian

2 would take long periods of time to get them back up.  We

3 would have investigators who worked remotely that their

4 computers would go down.  It would take Brian a

5 substantial amount of time mailing out, sending them

6 additional equipment that they may need which is down

7 time and they're not able to work.

8    Q    Okay.  Let me ask you about the pay increase.

9 Now, you said that you were told that there was no money

10 available when you first assumed the additional duties;

11 do I understand that correctly?

12    A    Yes.

13    Q    And who told you that?

14    A    Derick.

15    Q    Mr. Daniel.  Do you know whether Mr. Daniel as

16 the executive director increased anybody's salary for

17 assuming additional duties prior to his retirement?

18    A    I'm not exactly sure.  It was in that time

19 frame before -- during the transition that Ms. Snipes

20 received the pay increase.  I can't say who authorized

21 it.

22    Q    Okay.  So you don't know who authorized the

23 pay increase for Ms. Snipes?

24    A    I can't say, no.

25    Q    Other than Ms. Snipes is there anybody else

ACCURATE STENOTYPE REPORTERS, INC.

1   that you are claiming received a pay increase?

2        A    Well, all of the individuals who were hired

3   after me as investigation managers made more money than

4   I did as just the investigation manager than me when I

5   investigated all three of the sections.

6        Q    Okay.  Who in particular made more than you?

7        A    The individuals who took my -- who replaced

8   me.

9        Q    So Ms. Haskins?

10       A    Ms. Haskins, and I believe the other person

11   was Bowen.

12       Q    Did Ms. Haskins receive a pay increase, do you

13   know?

14       A    I'm not sure, but she made more money than I

15   did.

16       Q    Was it Mr. Bowen?

17       A    Bowen, uh-huh.

18       Q    Was he already internal at the time?

19       A    No, he was external.

20       Q    Okay.  Is he still there?

21       A    No.  He didn't stay very long.

22       Q    Okay.  And how about today, do you know --

23       A    Today now they have divided the unit into two.

24       Q    Okay.  But your specific claim, as I

25   understand it, is that you assumed additional duties,

```
 1    you did not receive a pay increase; Ms. Snipes took on
 2    additional duties, she did receive a pay increase; is
 3    that right?
 4         A    Yes, she did.
 5         Q    Is that correct?
 6         A    That's correct.
 7         Q    Okay.  Do you know of any other employee while
 8    you were employed at the Commission that took on
 9    additional duties and received a pay increase other than
10    Ms. Snipes?
11         A    I don't know of any other employee who took on
12    additional duties.
13         Q    Okay.  So the answer is no?
14         A    No.
15         Q    Who at the Commission, to your knowledge, can
16    grant a pay increase?
17         A    The executive director ultimately has to
18    approve it.
19         Q    Okay.  Is it your understanding that's the
20    only authority that can approve a pay increase?
21         A    It's my understanding.
22         Q    Okay.  When Mr. Daniel told you that there was
23    no money available had you requested a raise in pay?
24         A    In the past?
25         Q    At the time that you took on the additional
```

ACCURATE STENOTYPE REPORTERS, INC.

```
1   responsibilities?

2        A    When I took on the additional duties he said

3   to me right now we have no money available but when

4   money becomes available I will take care of you.

5        Q    And do you know if money was in fact available

6   at the time Mr. Daniel said that to you?

7        A    At the time he said that to me I took his word

8   that there was no money available.

9        Q    Okay.  So you don't know if there was in fact

10  money available?

11       A    I don't know.

12       Q    And he told you that in -- well, when?

13  Sometime in April of 2009?

14       A    Yes.

15       Q    So the next fiscal year began October -- Does

16  your fiscal year run October to September?

17       A    It's July 1.

18       Q    Okay.  So a couple months later the fiscal

19  year starts for July 1, and do you know if there was

20  additional money that was available to increase your pay

21  during that next fiscal year?

22       A    We were not privileged to the budget so I

23  don't know.

24       Q    So even when the budget is passed isn't that a

25  legislative process, isn't that a public record?
```

ACCURATE STENOTYPE REPORTERS, INC.

```
 1           MS. MATTOX:  Object to the form.  Calls for
 2      legal conclusion.
 3      A    Yes, that's true.  But how the money is going
 4  to be spent and what the money is needed for is an
 5  individual agency budget and I would not be privileged
 6  to that.
 7  BY MR. SPELLMAN:
 8      Q    Okay.  Did you ever make an additional request
 9  of Mr. Daniel after the conversation you have testified
10  to when you first assumed these additional duties to
11  increase your pay?
12      A    No, I did not.  I did make a request to
13  Ms. Wilson.
14      Q    And when was that?
15      A    When she became the co-interim director.
16      Q    Okay.  And do you have a ballpark of a time
17  frame that that took place?
18      A    I'm going to say maybe the end of July, around
19  the first of August.  She came to my office to talk with
20  me, she indicated that she wanted to give me some relief
21  and in order to give me some relief she was considering
22  moving the intake unit.  And at that time I said I've
23  managed it for this many years, I think I have it down
24  to a science, but a pay increase would help.
25      Q    And what did she say?
```

```
 1         A    No money available.

 2         Q    And how long after that conversation was the

 3    intake unit removed from your supervision?

 4         A    I'm going to say probably within a week, no

 5    more than two.

 6         Q    Now, you mentioned that she said something to

 7    you to the effect she wanted to give you some relief.

 8         A    Correct.

 9         Q    Relief from what?  What was your understanding

10    what that relief was?

11         A    My understanding that it was pretty clear that

12    I had a huge workload.

13         Q    There was no doubt about that?

14         A    No doubt about that.

15         Q    In between the time that you assumed the

16    duties of intake and customer service and Mr. Daniel

17    says I don't have the money right now and this

18    conversation with Ms. Wilson around the end of July,

19    beginning of August of 2011 --

20         A    Correct.

21         Q    -- did you have any occasion to request a pay

22    increase?

23         A    No, I didn't request an additional pay

24    increase from Mr. Daniel because it was constantly

25    discussed in our meetings that we didn't have funds.
```

```
 1        Q      Okay.   Do you have any knowledge whether any

 2   other employees at the Commission were promised a pay

 3   increase that they never received?

 4        A      Direct knowledge or only what they've told me?

 5        Q      Well, let's start with any direct knowledge.

 6        A      No.

 7        Q      Okay.   Has anyone told you they were promised

 8   a pay increase?

 9        A      Yes.

10        Q      Who?

11        A      Ms. Owens.

12        Q      Okay.   And what did she tell you?

13        A      That because she was such a high performing

14   manager that Derick had promised her whenever funds

15   became available that he would give her an increase.

16        Q      Okay.   Are you aware of any other employees

17   who have been promised a pay increase?

18        A      None that I know of.   But I want to clarify

19   one of my other answers.

20               When you asked me was I aware of other

21   employees who got a pay increase for taking on

22   additional duties.   Yes, the co-interim directors

23   received significant pay increases.

24        Q      And that's Mr. Kranert and Ms. Wilson,

25   correct?
```

1      A      Correct.

2      Q      Okay.  Now, with respect to Ms. Snipes, do you

3  know what her pay went from and to?

4      A      If I remember correctly she went from $36,000

5  to $47,000.

6      Q      And what is your understanding of the

7  additional duties that she assumed?

8      A      I never understood the additional duties.

9      Q      Do you have any understanding?

10      A      From what I understand, that she would be

11  performing some of the human resource manager duties.

12      Q      Anything else?

13      A      That's all that I know.

14      Q      Okay.  Have you taken any action to verify any

15  duties, additional duties, that she assumed?

16      A      There really would be no way for me to verify

17  what she did.  She was the administrative assistant to

18  the executive director.

19      Q      That was her original position, correct?

20      A      Correct.  And just by her signature on certain

21  documents she would sign either executive assistant to

22  the executive director or she would sign human resource

23  director so.

24      Q      Do you know of any other manager other than --

25  Well, strike that.

1             Did you consider Ms. Snipes to be on the

2    management team?

3        A    She wasn't a manager but she did attend our

4    meetings because she was the executive assistant to the

5    director and she made record of the meetings.

6        Q    Okay.  Aside from the co-interim executive

7    directors are you aware of anyone on the management team

8    who received a pay increase between the time you started

9    at the Commission and your termination?

10       A    Can I explain to you just what the management

11   team consisted of?  All of the people on the management

12   team did not actually manage employees but they were

13   just a part of the executive team.

14       Q    Okay.  How about just folks that were managers

15   that --

16       A    The only managers who managed employees and

17   managed the agency critical mission was myself and

18   Ms. Owens.  She was the housing investigator -- I mean,

19   the housing investigations manager, and I was the

20   employment investigations manager.

21       Q    Are you the only two that supervised employees

22   of the group that attended these management meetings?

23       A    The general counsel supervised attorneys and

24   some clerical staff.

25       Q    Okay.  Do you know when Ms. Snipes received

1    be a neutral agency.  If he calls up a respondent and

2    notifies them that a complaint is being sent we are no

3    longer being neutral.

4        Q      Okay.  Any other acts of retaliation?

5        A      Excuse me.

6        Q      Any other acts of retaliation?

7        A      Just out of the blue he calls me up and says I

8    need you to do an -- and honestly I believe this was on

9    a Monday, if it wasn't on a Monday it was the Friday, he

10   gave me one week notice I need you to train your

11   investigators, I have a training for your investigators

12   on Friday.

13          I sent him an email saying one week notice is

14   a short time frame, I won't be able to prepare by then.

15   Could you give me an extension.  And I can't remember

16   the date I asked him.  He never responded to the date.

17          But prior to him sending me that notice,

18   sending me that request saying that I train all my

19   investigators Larry had specifically said in a managers'

20   meeting, I don't know, maybe a year or two ago that

21   legal would be responsible for all formal training of

22   investigators.  So that just out of the blue came.

23          It appeared to me that what he was doing was,

24   you know, putting unreasonable demands on me that I

25   wouldn't be able to meet and possibly putting me in a

```
 1    position where he would have some reason to either write
 2    me up or start a negative employment file on me.  I
 3    can't say that it would have ultimately ended in
 4    termination, it may have.
 5             But I think that that along with the fact that
 6    then he requested that I create a backlog by taking in
 7    cases, by going through the deferrals which we discussed
 8    earlier and finding cases that were in the counties that
 9    were part of our work share agreement and opening up
10    those cases for investigation even though those cases
11    had been investigated by the EEOC and in some cases a
12    right to sue had already been issued, and I just thought
13    that that was wrong and that was -- and his reasoning
14    for wanting to do it he said was because we can't ask
15    the Legislature for money if we don't show a backlog.
16    Q    The training session that you were supposed to
17    do in a week, did you in fact do it?
18    A    I was terminated before I could even think
19    about doing it.
20    Q    So when was it that he asked you to do this
21    training?
22    A    I believe he asked me to do -- I can't say
23    specifically the date.  It was sometime in August.  But
24    I only had a one week window.  But I had by email
25    requested an extension of time, probably maybe two weeks
```

1   or the next week out, I can't recall.  But he never

2   responded to my email as far as giving me that extra

3   time.  So by him not responding to the email I assumed

4   that the date that I gave him was acceptable.

5          But I don't believe we ever got to that point

6   because I subsequently was terminated.

7       Q    Were you terminated that first week or the

8   second week?

9       A    I was terminated August 29th.

10      Q    So was that within a week of the request?

11      A    Not within a week of the request, but within

12   the time frame that I asked could I have an extension to

13   do the training.

14      Q    Any other examples of retaliation?

15      A    Well, just out of the blue one day they just

16   tell me intake is being taken away from you.  And I

17   said -- No, this is the email.  The email said intake

18   will no longer be reporting to you, effective

19   immediately intake will report to legal.

20          And I attempted to get some understanding of

21   what that all entailed because intake is more the intake

22   of complaints, the unit itself.  Was that customer

23   service, was it records retention, did it include the

24   telephones, did it include the mail?

25          You know, and at that particular time we had a

1    transition of people from John Godwin was going to

2    replace Jamilia, Tammy Barton was going to replace John

3    Godwin.    I didn't have people in place to replace -- to

4    take the duties that Tammy was doing.

5             And I tried to get clarification from him

6    about one position that I had that reported to me which

7    was Tammy's position that she assisted me in inputting

8    and assigning cases to the intake investigators.   I

9    could never get any response from Larry as to how this

10   was all supposed to work effective immediately.   His

11   response to me is nothing changes, they just report to

12   legal.

13            Well, everything changes because there is

14   still a whole lot of work to do.   Who is doing it?

15   Nothing changes, they just report to legal.

16            Otherwise, I'm still doing -- I can't just not

17   do the work.   I'm still doing it while trying to find

18   clarification.

19            So it seemed to me suddenly once he became my

20   supervisor just trying to overburden me and make the

21   responsibilities that I've carried out pretty

22   effectively for the last three years very difficult to

23   do in the way that he wanted me to do them by making

24   these unreasonable demands on me.

25            So I felt that that was retaliation making

1    good on his promise that he was going to retaliate

2    against the person who reported him for making those

3    comments.

4         Q    Now, I thought you told us when Mr. Spellman

5    was questioning you that it was Ms. Wilson who told you

6    intake was going to be taken away from you?

7         A    I got an email -- Ms. Wilson came to my office

8    and said we want to give you some relief.  We're

9    thinking about moving intake, putting intake into a

10   different unit.  I said to Ms. Wilson, I think it works

11   really well the way we have it.

12             And actually it was.  If intake is done

13   properly it makes the investigation process much easier

14   and less burdensome on the investigator.  Because me

15   being the investigator, I can make sure they have

16   everything they need prior to the case going to them

17   without -- and I was in a position where I could make

18   decisions about cases as far as if it was being dually

19   investigated or if EEOC wanted to take the case, you

20   know, or if we wanted to take the case.  I could make

21   those decisions without having to go to another manager

22   and it would decrease the dance.

23             So I really want to keep it regardless of the

24   money because it actually helped the investigative

25   process.  She simply said to me I want to give you some

ACCURATE STENOTYPE REPORTERS, INC.

```
 1   significant number until after April, May, and then they
 2   started coming in as they should come in.
 3         But the reason that I couldn't commit is
 4   because from April to September you are talking about
 5   it's not that far away to the end of the federal fiscal
 6   year.  See, normally you should start getting these
 7   cases in for the federal fiscal year you start giving
 8   them new numbers on October 1st to be counted toward the
 9   contract.  So we went October, November, December,
10   January, February, March, April not getting a
11   significant number of cases from EOC.
12         And so from a time line perspective I could
13   not legitimately say, oh, yes, I can meet this time line
14   because many of those cases were under the statutory 180
15   day time limit, they were relatively young cases.  And I
16   can't make a promise of something that I --
17         You know, I felt that we would do it but I
18   couldn't say absolutely because you don't know, the
19   cases are too young.
20    Q    Is that the year that you went into the
21   deferral cases to find additional cases to meet the
22   number?
23    A    We didn't go into the deferral unit to find
24   the additional cases.  We went into the deferrals to see
25   if EEOC was just not sending us cases that they should
```

```
 1   have been sending to us.  And we discovered that there

 2   was a significant number of cases that EEOC could have

 3   referred to us but they kept them.  And the reason they

 4   kept them was they had a new intake manager who didn't

 5   understand the process.

 6        Q    Right.  I remember that testimony.

 7             (Defendant's Exhibit 15 was marked for

 8        identification.)

 9   BY MR. DERR:

10        Q    In this email from Mr. Kranert to you

11   July 26th, 2011 he says that you are now at 62 percent

12   of contract.

13        A    That's what he said.

14        Q    You disagree with that?

15        A    Yes.  There is no way that I could have been

16   at 62 percent of a contract in June and -- When did he

17   send this?

18        Q    July 26th.

19        A    What I believe that he wasn't doing, and I did

20   ask the question but I don't see any answer to it and I

21   don't think I got an answer.

22             Remember the cases that you have in suspense.

23   You can't just look at the cases that I've sent to EEOC,

24   you also have to count the cases that -- and daily cases

25   are being completed and determinations are going out.
```

1    he was trained by another investigator and by myself

2    one-on-one as to what the process was.  But he was

3    previously a probation officer so he already had, you

4    know, a pretty good grasp of analytical skills and that

5    type of thing and communicating and interviewing.  So I

6    don't know what the issue was with him.

7        Q    Okay.  So Mr. Daniel's comment that this issue

8    of training keeps coming up was just not accurate?

9        A    Well, I don't know who it keeps coming up

10   from.  He is not specific.  So I can't -- I don't know.

11       Q    You don't know what he means by that?

12       A    I don't.  I can only relate to the email that

13   I got.

14       Q    You weren't aware of any problem with training

15   in your department?

16       A    Not until Larry requested that I do training

17   in a week's time.  And I still wasn't clear exactly what

18   he wanted me to train the investigators on because most

19   of the investigators were very experienced

20   investigators.

21            And generally what I would do is because you

22   don't hire a lot of investigators at one time, you

23   generally are hiring like one person at a time, it's

24   teamwork and it's very helpful.  I would always partner

25   them with an experienced investigator including myself

## CERTIFICATE OF OATH

1

2   STATE OF FLORIDA     )
                         ) SS:
3   COUNTY OF LEON       )

4        I, KIMBERLY S. BARTHOLOMEW, Professional

5   Court Reporter, Notary Public in and for the State

6   of Florida at Large, certify that the witness,

7   Sylvia Barge, personally appeared before me and was

8   duly sworn.

9        WITNESS my hand and official seal this

10   15th day of May, 2013.

11

12                       KIMBERLY S. BARTHOLOMEW,
                         Professional Court Reporter and
13                       Notary Public, State of Florida
     My commission        Notary #DD949826
14   expires: 2/23/14

15

16

17

18

19

20

21

22

23

24

25

ACCURATE STENOTYPE REPORTERS, INC.

```
1              REPORTER'S DEPOSITION CERTIFICATE

2

3         I, KIMBERLY S. BARTHOLOMEW, Professional

4    Court Reporter, certify that I was authorized to and

5    did stenographically report the deposition of Sylvia

6    Barge, the witness herein; that a review of the

7    transcript was requested; that the foregoing pages

8    are a true and complete record of my stenographic

9    notes of the deposition by said witness; and that

10   this computer-assisted transcript was prepared under

11   my supervision.

12        I further certify that I am not a

13   relative, employee, attorney or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties' attorney or counsel connected with

16   the action.

17        DATED this 15th day of May, 2013.

18

19

20
     KIMBERLY S. BARTHOLOMEW,
21   Professional Court Reporter

22

23

24

25
```

ACCURATE STENOTYPE REPORTERS, INC.